# UNITED STATES DISTRICT COURT
## District of Columbia

ROBERT T. LEE, *et al.*                           *

        Plaintiffs,                        *

v.                                                *    Case Number:  JDB-06-2184

PHILLIP MORSE, *et al.*                           *

        Defendants.                        *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## PRINCE GEORGE'S COUNTY DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

Defendants, Prince George's County, Maryland (the "County"), Chief Melvin High, and unnamed John Doe Officers of the Prince George's County Police Department (collectively, the "County Defendants"), by their undersigned counsel, pursuant to Rules 7, 12 and 56 of the Federal Rules of Civil Procedure and Local Rule 7, hereby file this motion to dismiss, or alternatively, motion for summary judgment and state as follows:

1.      Officers from the Prince George's County Police Department never pursued, chased, or followed the stolen car in which Plaintiff Alyce Summers and Plaintiff Robert Lee's daughter, Jewel West, were passengers when the car crashed.

2.      Officers from the Prince George's County Police Department never saw Ms. Summers or Ms. West enter the stolen car.

3.      There is no factual basis on which to predicate liability of the County Defendants.

4.      No violation of a federal statute or of federal civil rights has been stated against the County Defendants.

5.    The County Defendants incorporate the accompanying memorandum in support of this motion as if fully set forth herein.

WHEREFORE, Defendants Prince George's County, Chief Melvin High, and unnamed John Doe Officers of the Prince George's County Police Department respectfully request this Court to grant judgment in their favor and to dismiss all claims alleged against them in the Complaint.

Respectfully submitted,

/s/
Michael P. Cunningham, Bar No. 481932
mcunningham@fblaw.com
Funk & Bolton, P.A.
36 South Charles Street, 12th Floor
Baltimore, Maryland  21201
410/659-7700 (telephone)
410/659-7773 (facsimile)
*Attorneys for Defendants Prince George's County,*
*Police Chief Melvin High, and unnamed Officers of*
*the Prince George's County Police Department*

50002.029:105082.2

- 2 -

# UNITED STATES DISTRICT COURT

## District of Columbia

ROBERT T. LEE, *et al.*                  *

        Plaintiffs,               *

v.                            *     Case Number:  JDB-06-2184

PHILLIP MORSE, *et al.*            *

        Defendants.           *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF PRINCE GEORGE'S COUNTY DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

Defendants, Prince George's County, Maryland (the "County"), Chief Melvin High, and unnamed John Doe Officers of the Prince George's County Police Department (collectively, the "County Defendants"), by their undersigned counsel, pursuant to Rules 7, 12 and 56 of the Federal Rules of Civil Procedure and Local Rule 7, in further support of their motion to dismiss, or alternatively, for summary judgment, state as follows:

### I.    OVERVIEW

On December 24, 2005, approximately one-half hour after midnight, Patrick Devon carjacked the red BMW convertible of Errol Robinson as Mr. Robinson was attempting to leave the Prince George's Plaza Mall in Hyattsville, Maryland.  After Mr. Devon fled from the mall in the stolen vehicle, Mr. Robinson called for police assistance.  A few minutes after the carjacking, Officer Simpson (now Officer Simpson Powell) of the Prince George's County Police Department responded to the mall to assist Mr. Robinson and take his statement about what happened.

A short time later, the daughter of Plaintiff Robert T. Lee, Jewell West, and Plaintiff Alyce Summers, who were leaving Union Station in Washington, D.C. where they had just finished watching a movie, accepted a ride from Mr. Devon in the stolen car. Soon thereafter, an officer from the U.S. Capital Police Department observed Mr. Devon commit a traffic violation in the stolen car and initiated pursuit of the car for the traffic violation. Mr. Devon fled from the officer at a high rate of speed. He eventually crashed the stolen car while speeding down Pennsylvania Avenue across the Sousa Bridge. Mr. Devon and Ms. Jewell died in the accident. Ms. Summers was injured in the accident.

Plaintiffs allege that police officers from the Prince George's County Police Department, the Metropolitan Police Department, and the U.S. Capital Police Department all participated in the high speed chase of the stolen car. In this suit, Plaintiffs seek monetary damages from Defendants for the allegedly wrongful high speed chase of the stolen car, which they claim resulted in the death of Ms. Jewell and bodily injury to Ms. Summers.

## II.    THE COMPLAINT

Plaintiffs style the Complaint as "a civil action brought pursuant to 42 U.S.C. [§] 1983 and the 4th and 5th Amendments to the United States Constitution seeking ... both compensatory and punitive damages against the defendants." (Compl. ¶ 1.) The Complaint contains six counts: Count I is the 42 U.S.C. §§ 1983 & 1988 claim for deprivations of 4th and 5th Amendment rights; Count II is a survival act claim brought pursuant to D.C. Code Ann., § 12-201; Count III is a wrongful death claim; Count IV is a claim for negligent training and supervision; Count V is a claim for gross negligence; and Count VI is a claim for assault and battery. In the *ad damnum* clause following each count, Plaintiffs' seek $5,000,000 in compensatory and $5,000,000 in punitive damages.

There apparently are four County Defendants. (*Id.* ¶¶ 8-10, 16.) Prince George's County is sued as the employer of the unidentified police officers of the Prince George's County Police Department who allegedly engaged in the pursuit of the stolen vehicle. (*Id.* ¶ 8.) Chief High is sued as the Chief of the Prince George's County Police Department due to his overarching responsibility for the day-to-day operations of the police department. (*Id.* ¶ 9.) There were allegedly two unnamed officers of the police department who allegedly followed the car from Hyattsville to Washington, D.C., observed Ms. West and Ms. Summers enter the car, and participated in the pursuit of the stolen car. (*Id.* ¶¶ 10, 16, 18.) They are sued for their alleged participation in the pursuit and high speed chase of the stolen car.

Subject matter jurisdiction is predicated solely on 28 U.S.C. § 1331 and 1343 and 42 U.S.C. § 1983. (*Id.* ¶ 2.) In short, subject matter is predicated solely on the alleged federal statutory violation, which also is a federal civil rights violation. All of the remaining claims are state statutory or common law claims for which this court purportedly has pendent jurisdiction. If the § 1983 claim falls, this Court no longer has jurisdiction as the claims are pled.

The Complaint is very sparse in terms of factual allegations. Plaintiffs allege that on December 24, 2005 Ms. Jewell and Ms. Summers accepted a ride from an unidentified man, who, unknown to them, was driving a stolen 2003, 2-door BMW Z4, bearing District of Columbia vehicle tag number BY1037 and VIN 4USBT33413LS44253. (*Id.* ¶¶ 14-15.) Unidentified officers from all three defendant police departments allegedly engaged in a high speed pursuit of the stolen car. (*Id.* ¶¶ 17-18.) During the high speed chase, the driver lost control of the car and it crashed in the 1700 block of Pennsylvania Avenue after striking the north and south curbs and a light pole. (*Id.* ¶ 19.) Ms. West died from the crash when she was ejected from the stolen car, and Ms. Summers was injured during the crash. (*Id.* ¶ 20-21.) There

is no allegation that the police attempted to establish a roadblock or in any manner struck or impeded the flight of the stolen car. There is no allegation about the duration of the alleged pursuit or any specific acts of the police during the alleged pursuit.

### III.    THE UNDISPUTED MATERIAL FACTS

Contrary to the allegations in the Complaint, no officer from the Prince George's County Police Department ever chased, pursued or followed the stolen car. (Affs. of Simpson Powell, Person, Domagauer and Gheen.) Likewise, no one from the Prince George's County Police Department ever observed Ms. West or Ms. Summers enter the stolen car. (*Id.*) After receiving a call from Mr. Robinson, whose red, 2-door 2003 BMW Z4 with District of Columbia vehicle tag number BY1037 and VIN No. 4USBT33413LS44253 was stolen shortly after midnight on December 24, 2005, Officer Simpson Powell was dispatched to contact Mr. Robinson and to report on what happened. (Aff. of Simpson Powell ¶ 3; Aff. of Domagauer, ¶ 7.) Officer Simpson Powell did so and after contacting Mr. Robinson and obtaining the pertinent information, she contacted Prince George's County dispatch, who broadcasted a "be on the look-out" for the stolen car. Officer Simpson Powell never saw the stolen car, and never gave pursuit of it. (Aff. of Simpson Powell ¶ 7.) She remained in the parking lot of the mall where the car was stolen with Mr. Robinson until a taxi arrived to take him home. (*Id.* ¶ 6.)

No one from the Prince George's County Police Department ever saw the stolen car until after it had crashed. (Affs of Person, Domagauer and Gheen.) After the car crashed, Detective Person received a call that the car had crashed and the location of the car. (Aff. of Person ¶ 7.) After receiving that call, he drove to the scene of the accident to confirm that the car was the same vehicle that Mr. Robinson had earlier reported as being stolen. (*Id.* ¶ 8.) After confirming

that the car belonged to Mr. Robinson and that the carjacker had died during the accident in the District of Columbia, the case was closed. (Aff. of Domagauer.)

IV.    STATEMENT OF THE LAW

Any defendant may file a motion to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12 (b)(6). A Rule 12(b)(6) disposition must be made on the face of the complaint alone. *Tele-communications of Key West, Inc. v. United States of America,* 757 F. 2d 1330, 1335 (D.C. Cir. 1985). The normal course of action when materials outside the complaint are considered is for a nominal motion to dismiss to be treated as a motion for summary judgment. *Tele-communications of Key West,* 757 F. 2d at 1334. Thus, on a Rule 12(b)(6) motion, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. *Tele-communications of Key West,* 757 F. 2d at 1334. *See also Marshall County Health Care Authority v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("When a district court is not sitting as an appellate court and the district court judge looks outside the complaint to factual matters, the court must convert a motion to dismiss into a motion for summary judgment.").

V.    ARGUMENT

A.    <u>The County Defendants Are Entitled To Judgment Because The Facts Upon Which Liability Is Predicated Are Fictitious.</u>

Liability against the County Defendants is predicated on the following factual allegations: (1) Officers from the Prince George's County Police Department followed the stolen car from Hyattsville into the District of Columbia (Compl. ¶ 16); (2) Officers from the Prince George's County Police Department observed Ms. West and Ms. Summers enter the stolen car and made no effort to warn them of impending danger (*Id.*); (3) a high speed chase of the stolen vehicle ensued in the District of Columbia in which officers from the Prince George's

County Police Department participated (*Id.* ¶¶ 17-18); and (4) the Prince George's County Police Officers had no authority to exercise police powers in the District of Columbia, yet their participation in the pursuit of the stolen car in the District of Columbia was part of a consistent pattern and practice of the County in condoning the pervasive misconduct and abuse of authority (*Id.* ¶ 22).[1]  The allegations are baseless.  No one from the Prince George's County Police Department ever chased, pursued or followed the stolen car.  No one from the Prince George's County Police Department ever saw Ms. West or Ms. Summers enter the stolen car.  Any alleged pattern or practice of the police officers of Prince George's County condoning misconduct and abuse of authority has absolutely no causal nexus to the death of Ms. West or any injury suffered by Ms. Summers.  There are no facts that support any liability of the County Defendants under the claims alleged against them.

---

[1] This allegation is incorrect as a matter of law.  D.C. Code § 23-901, entitled, "Arrests in the District of Columbia by officers of other States," states that:

> Any member of a duly organized peace unit of any State (or county or municipality thereof) of the United States who enters the District of Columbia in fresh pursuit and continues within the District of Columbia in fresh pursuit and continues within the District of Columbia in fresh pursuit of a person in order to arrest him on the ground that he is believed to have committed a felony in such State shall have the same authority to arrest and hold that person in custody as has any member of any duly organized peace unit of the District of Columbia to arrest and hold in custody a person on the ground that he is believed to have committed a felony in the District of Columbia.  This section shall not be construed so as to make unlawful any arrest in the District of Columbia which would otherwise be lawful.

D.C. Code § 23-901.

The term "fresh pursuit" is defined as the "pursuit of a person who has committed a felony or one who the pursuing officer has reasonable grounds to believe has committed a felony."  D.C. Code § 23-903.  Such term includes the pursuit of a person who the pursuing officer has reasonable grounds to believe has committed a felony, although no felony has actually been committed, if there is reasonable ground for believing that a felony has been committed.  *Id.*  "Fresh pursuit" does not necessarily imply an instant pursuit, but pursuit without unreasonable delay.  *Id. See Cole v. United States*, 678 A.2d 554, 555 (D.C. 1996) (Fresh pursuit is pursuit conducted from clue to clue in a diligent manner.)

Had a County Defendant pursued the stolen car, such pursuit would have been lawful.

B.     Plaintiffs Have Failed To Allege A Violation Of Their Fourth Or Fifth Amendment Rights And The County Defendants Are Entitled To Judgment On The § 1983 Claims, Thereby Vitiating Subject Matter Jurisdiction.

The threshold question to be resolved in a § 1983 action is whether the facts alleged show that the conduct of the officer violated a constitutional right. *Scott v. Harris*, Slip op. at 3-4; 550 U.S. ___, at ___ (2007);[2] *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). The only allegedly culpable conduct of the County Defendants is allegedly engaging in the high speed pursuit of a stolen car. The Supreme Court has refused to lay down a rule requiring the police to allow a fleeing suspect to get away whenever such suspect drives so recklessly that the suspect puts other people's lives in danger. *Scott*, Slip Op. at 12-13. *Accord*, *Lewis*, 523 U.S at 855. Such rule would provide incentive for every fleeing suspect to drive recklessly to escape apprehension, and the Constitution assuredly does not impose such invitation to impunity earned by recklessness. *Scott*, Slip Op. at 13. Police engagement in a high speed chase of a violator of the traffic laws does not constitute a violation of the Fourth Amendment. *Lewis*, 523 U.S. at 843-844. Such conduct, likewise, does not constitute a violation of the Fourteenth Amendment's substantive due process clause. *Id.* at 854. Finally, no case has ever held that such conduct violates any right conferred under the Fifth Amendment. Quite simply, the alleged conduct of the County Defendants does not violate any constitutional right. The County Defendants are entitled to judgment on Count I, the § 1983 claim, for failure to state a claim upon which relief may be granted.

Subject matter jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343. Section 1331 provides federal question jurisdiction and Section 1343 provides jurisdiction for civil rights violations secured by any Act of Congress. (Compl.¶ 2.) Subject matter jurisdiction is predicated on the 42 U.S.C § 1983 claim. Plaintiffs have failed to state a claim for which relief

---

[2] A copy of the Slip Opinion is attached as an appendix.

may be granted under § 1983. Because the basis upon which subject matter jurisdiction is predicated as to the County Defendants fails, this Court has no subject matter jurisdiction over the County Defendants.

C.    Having Failed To State A Federal Statutory Or Civil Rights Claim, There Is No Pendent Jurisdiction For The Other Claims.

The district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c). *See also Cronauer v. United States,* 2006 U.S. Dist. LEXIS 67351, *11 (Dist. D.C. 2006). Where all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on their merits. *See Cronauer* 2006 U.S. Dist. LEXIS at *7-13. This rule especially holds true when a request for dismissal based on lack of supplemental jurisdiction is made at an early stage of litigation. *See Cronauer* at *7.

Federal subject matter jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343. Because the County Defendants are entitled to judgment on the federal claims alleged in the Complaint, all that remains are the pendent state statutory and common law claims. This Court should decline to exercise pendent jurisdiction over such state claims brought against Defendants if it does not grant summary judgment on those counts in favor of the County Defendants.

D.    Plaintiffs Are Not Entitled To Relief From The County Defendants Under The Survival Act Of The District Of Columbia.

Plaintiffs allege in Count II of their Complaint, entitled "Survival Act," that they are entitled to damages "pursuant to D.C. Code § 12-201." Preliminarily, Plaintiffs are not entitled to recovery under D.C. Code § 12-201 because there is no such section in the D.C. Code. A claim under the Survival Act (D.C. Code § 12-101) is dependent upon a valid underlying cause

of action since such claim merely attaches to such underlying cause of action prior to death and is not an independent cause of action. *Arrington v. District of Columbia,* 673 A.2d 674, 677 (D.C. 1996). If there is no underlying claim, then there is no right of action under the Survival Act. Because the "facts" alleged and upon which any underlying claim against the County Defendants is predicated do not exist, Plaintiffs can prove no underlying claim of misconduct against the County Defendants. Judgment in favor of the County Defendants, therefore, should be granted on Count II, which seeks relief under the Survival Act.

      E.    <u>Plaintiffs Are Not Entitled To Relief From The County Defendants Under The Wrongful Death Statute Of The District Of Columbia</u>.

Plaintiffs seek relief under the wrongful death statute of the District of Columbia. The District of Columbia's "Wrongful Death" statute states that "when, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation," and the person injured could have recovered if death had not occurred, the spouse, domestic partner, or next of kin may maintain an action against the person or corporation causing the death to recover damages for the death. *See* D.C. Code § 16-2701. Given the undisputed material facts, the County Defendants did not engage in any wrongful actions, neglect or default. Even assuming, for the sake of argument, that the County Defendants pursued the suspect vehicle from Maryland to the District of Columbia, because the County Defendants would have had the legal authority to pursue the carjacked vehicle and effectuate an arrest (*see* footnote 1 *supra*), the Complaint fails to allege that the County Defendants engaged in any wrongful actions, neglect or default. *See* D.C. Code §§ 23-901 and 23-903. Again, the County Defendants are entitled to judgment in light of the undisputed material facts.

F.    Plaintiffs Cannot Establish That County Defendants Were Grossly Negligent.

To support a common law cause of action for gross negligence, the plaintiffs must establish (1) that there is a duty of care owed to the plaintiffs by the defendants; (2) that there was a breach of that duty; (3) that there was damage to the plaintiff; and (4) that the breach of the duty by the defendants proximately caused the damage. *Lyles v. Micenko*, 468 F. Supp. 2d 68, 76 (D.C. 2006). The plaintiff must prove that the allegedly negligent conduct "played a substantial part in bringing about the injury and the injury was either a direct result or a reasonably probable consequence of the conduct." *District of Columbia v. Walker*, 689 A.2d 40, 46 (D.C. 1997) (citing *Sanders v. Wright*, 642 A.2d 847 (D.C. 1994)). Given the undisputed material facts, Plaintiffs can not establish that the County Defendants owed them any duty of care or that there was a breach of any duty by the County Defendants. Again, the factual underpinning necessary to support a claim of negligence or gross negligence by the County Defendants does not exist and the County Defendants are entitled to judgment in their favor on Count V of the Complaint.

G.    Plaintiffs Have Failed To State A Claim Of Assault And Battery Against The County Defendants.

Although assault and battery are technically distinct intentional torts, they are often pled in conjunction as a single count. *See Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997). In Count VI, entitled "Assault and Battery," Plaintiffs allege that County Defendants "intentionally and without legal justification, engaged in a high-speed chase of the vehicle;" and that as a direct and proximate result of such "willful, malicious and intentional actions," caused Plaintiffs to suffer serious physical injuries. (Compl. ¶¶ 42-43.) Again, given the undisputed material facts there is no factual underpinning in support of a claim of assault and battery.

Even assuming, for the sake of argument, the truth of the allegations in the Complaint, Plaintiffs have failed to state a claim for assault or battery. An assault is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff." *Holder,* 700 A.2d at 741. A battery is an intentional act that causes a harmful or offensive bodily contact. *Id.* An essential element of the torts of assault and battery is the alleged intent of Defendants to place Plaintiffs in harm or fear of harm. *Madden v. D.C. Transit System, Inc.,* 307 A.2d 756, 757 (D.C. Cir. 1973). Absent such allegations of intent on the part of Defendants, the allegations of assault and battery are deficient. *Madden,* 307 A.2d at 757. Conclusory allegations of wanton and malicious conduct are insufficient to satisfy the requisite intentionality as such allegations are nothing more than legal conclusions which the court is not bound to accept. *Id.*

The allegations of assault and battery are deficient because they fail to establish factually that the County Defendants had any intent to place Plaintiffs in fear of imminent bodily harm or to harmfully touch Plaintiffs. The Complaint is devoid of any allegation that the County Defendants pursued the suspect vehicle, attempted to strike, slam into, box in, and/or barricade the suspect vehicle, or otherwise engaged in any act that threatened to harm Plaintiffs. The Complaint alleges merely that the County Defendants did not discontinue their lawful pursuit of the stolen car. Such lawful conduct simply does not rise to the level of an intentional tort of assault and battery. No case ever has so held. For the reasons stated, Plaintiffs' allegations of assault and battery in Count VI are conclusory and fail to state a claim for which relief can be granted. Count VI should be dismissed as a matter of law or, alternatively, judgment should be granted in favor of the County Defendants.

VI.     CONCLUSION

As set forth herein, the County Defendants are entitled to judgment in their favor under each count of the Complaint.

Respectfully submitted,

_____/s/_____
Michael P. Cunningham, Bar No. 481932
mcunningham@fblaw.com
Funk & Bolton, P.A.
36 South Charles Street, 12th Floor
Baltimore, Maryland  21201
410/659-7700 (telephone)
410/659-7773 (facsimile)
*Attorneys for Defendants Prince George's County,
Police Chief Melvin High, and unnamed Officers of
the Prince George's County Police Department*

50002.029:104701.3

# UNITED STATES DISTRICT COURT
## District of Columbia

Robert T. Lee, *et al.*                    *

          Plaintiffs,                    *

v.                                          *        Case Number:  JDB-06-2184

Phillip Morse, *et al.*                     *

          Defendants.                    *

*    *    *    *    *    *    *    *    *    *    *    *

## ORDER

Upon review of the County Defendants' Motion to Dismiss, or alternatively, motion for summary judgment, and all papers filed and any proceedings held in conjunction therewith, it is this ___ day of _____ 2007, by the United States District Court for the District of Columbia, hereby:

**ORDERED** that, judgment is **GRANTED** in favor of Defendants, Prince George's County, Police Chief Melvin High, and the unnamed police officers of the Prince George's County Police Department (collectively the "County Defendants") and the Complaint against the County Defendants is **DISMISSED WITH PREJUDICE.**

 

_____
The Honorable Judge John D. Bates

Dated: _____, 2007

50002.029:105082.2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 15th of May 2007, a copy of Defendant, Prince George's County's Motion to Dismiss, or Alternatively, for Summary Judgment, Memorandum in Support of Prince George's County's Motion to Dismiss, or Alternatively, for Summary Judgment, and proposed Order were filed electronically in the United States District Court for the District of Columbia and mailed, first class, postage prepaid, to any person entitled to service not served as a result of said electronic filing.

Phillip Morse
19 D Street, NE
Washington, DC  20510

U.S. Capitol Police
19 D Street, NE
Washington, DC  20510

Charles Ramsey
Chief of the Metropolitan Police Department
400 Indiana Avenue, NW
Washington, DC  20001

_____/s/_____
Michael P. Cunningham

50002.029:105082.2

1 of 3 DOCUMENTS



Analysis
As of: May 14, 2007

TIMOTHY SCOTT, PETITIONER v. VICTOR HARRIS

No. 05-1631

SUPREME COURT OF THE UNITED STATES

*127 S. Ct. 1769; 2007 U.S. LEXIS 4748; 75 U.S.L.W. 4297*

**February 26, 2007, Argued**
**April 30, 2007, Decided**

**NOTICE:** [*1] The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT. *Harris v. Coweta County, 433 F.3d 807, 2005 U.S. App. LEXIS 28484 (11th Cir. Ga., 2005)*

**DISPOSITION:** Reversed.

**SYLLABUS:** Deputy Timothy Scott, petitioner here, terminated a high-speed pursuit of respondent's car by applying his push bumper to the rear of the vehicle, causing it to leave the road and crash. Respondent was rendered quadriplegic. He filed suit under *42 U.S.C. § 1983* alleging, *inter alia,* the use of excessive force resulting in an unreasonable seizure under the *Fourth Amendment.* The District Court denied Scott's summary judgment motion, which was based on qualified immunity. The Eleventh Circuit affirmed on interlocutory appeal, concluding, *inter alia,* that Scott's actions could constitute "deadly force" [*2] under *Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1*; that the use of such force in this context would violate respondent's constitutional right to be free from excessive force during a seizure; and that a reasonable jury could so find.

*Held:* Because the car chase respondent initiated posed a substantial and immediate risk of serious physical injury to others, Scott's attempt to terminate the chase by forc-

ing respondent off the road was reasonable, and Scott is entitled to summary judgment. Pp. 3-13.

(a) Qualified immunity requires resolution of a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272.* Pp. 3-4.

(b) The record in this case includes a videotape capturing the events in question. Where, as here, the record blatantly contradicts the plaintiff's version of events so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion. Pp. 5-8.

(c) Viewing the facts in the light depicted by the videotape, [*3] it is clear that Deputy Scott did not violate the *Fourth Amendment.* Pp. 8-13.

(i) *Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force." The Court there simply applied the *Fourth Amendment's* "reasonableness" test to the use of a particular type of force in a particular situation. That case has scant applicability to this one, which has vastly different facts. Whether or not Scott's actions constituted "deadly force," what matters is whether those actions were reasonable. Pp. 8-10.

(ii) In determining a seizure's reasonableness, the Court balances the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the im-

portance of the governmental interests allegedly justifying the intrusion. *United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637, 77 L. Ed. 2d 110.* In weighing the high likelihood of serious injury or death to respondent that Scott's actions posed against the actual and imminent threat that respondent posed to the lives of others, the Court takes account of the number of lives at risk and the relative culpability of the parties involved. Respondent intentionally [*4] placed himself and the public in danger by unlawfully engaging in reckless, high-speed flight; those who might have been harmed had Scott not forced respondent off the road were entirely innocent. The Court concludes that it was reasonable for Scott to take the action he did. It rejects respondent's argument that safety could have been assured if the police simply ceased their pursuit. The Court rules that a police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the *Fourth Amendment,* even when it places the fleeing motorist at risk of serious injury or death. Pp. 10-13.

*433 F.3d 807,* reversed.

**JUDGES:** SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, SOUTER, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined. GINSBURG, J., and BREYER, J., filed concurring opinions. STEVENS, J., filed a dissenting opinion.

**OPINION BY:** SCALIA

**OPINION:**

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether a law enforcement official can, consistent with the *Fourth Amendment,* attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the [*5] motorist's car from behind. Put another way: Can an officer take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders?

I

In March 2001, a Georgia county deputy clocked respondent's vehicle traveling at 73 miles per hour on a road with a 55-mile-per-hour speed limit. The deputy activated his blue flashing lights indicating that respondent should pull over. Instead, respondent sped away, initiating a chase down what is in most portions a two-lane road, at speeds exceeding 85 miles per hour. The deputy radioed his dispatch to report that he was pursu-

ing a fleeing vehicle, and broadcast its license plate number. Petitioner, Deputy Timothy Scott, heard the radio communication and joined the pursuit along with other officers. In the midst of the chase, respondent pulled into the parking lot of a shopping center and was nearly boxed in by the various police vehicles. Respondent evaded the trap by making a sharp turn, colliding with Scott's police car, exiting the parking lot, and speeding off once again down a two-lane highway.

Following respondent's shopping center maneuvering, [*6] which resulted in slight damage to Scott's police car, Scott took over as the lead pursuit vehicle. Six minutes and nearly 10 miles after the chase had begun, Scott decided to attempt to terminate the episode by employing a "Precision Intervention Technique ('PIT')' maneuver, which causes the fleeing vehicle to spin to a stop." Brief for Petitioner 4. Having radioed his supervisor for permission, Scott was told to "'go ahead and take him out.'" *Harris v. Coweta County, 433 F.3d 807, 811 (CA11 2005).* Instead, Scott applied his push bumper to the rear of respondent's vehicle. n1 As a result, respondent lost control of his vehicle, which left the roadway, ran down an embankment, overturned, and crashed. Respondent was badly injured and was rendered a quadriplegic.

n1 Scott says he decided not to employ the PIT maneuver because he was "concerned that the vehicles were moving too quickly to safely execute the maneuver." Brief for Petitioner 4. Respondent agrees that the PIT maneuver could not have been safely employed. See Brief for Respondent 9. It is irrelevant to our analysis whether Scott had permission to take the precise actions he took.

[*7]

Respondent filed suit against Deputy Scott and others under Rev. Stat. § 1979, *42 U.S.C. § 1983,* alleging, *inter alia,* a violation of his federal constitutional rights, viz. use of excessive force resulting in an unreasonable seizure under the *Fourth Amendment.* In response, Scott filed a motion for summary judgment based on an assertion of qualified immunity. The District Court denied the motion, finding that "there are material issues of fact on which the issue of qualified immunity turns which present sufficient disagreement to require submission to a jury." *Harris v. Coweta County, No. 3:01-CV-148-WBH, 2003 U.S. Dist. LEXIS 27348 (ND Ga., Sept. 23, 2003),* App. to Pet. for Cert. 41a-42a. On interlocutory appeal, n2 the United States Court of Appeals for the Eleventh Circuit affirmed the District Court's decision to allow respondent's *Fourth Amendment* claim against Scott to proceed to trial. n3 Taking respondent's view of the facts

as given, the Court of Appeals concluded that Scott's actions could constitute "deadly force" under *Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)*, and that the use of such force in this context "would violate [respondent's] constitutional [*8] right to be free from excessive force during a seizure. Accordingly, a reasonable jury could find that Scott violated [respondent's] *Fourth Amendment* rights." *433 F.3d at 816.* The Court of Appeals further concluded that "the law as it existed [at the time of the incident], was sufficiently clear to give reasonable law enforcement officers 'fair notice' that ramming a vehicle under these circumstances was unlawful." *Id., at 817.* The Court of Appeals thus concluded that Scott was not entitled to qualified immunity. We granted certiorari, *549 U.S.     , 127 S. Ct. 468, 166 L. Ed. 2d 333 (2006)*, and now reverse.

> n2 Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).* Thus, we have held that an order denying qualified immunity is immediately appealable even though it is interlocutory; otherwise, it would be "effectively unreviewable." *Id., at 527, 105 S. Ct. 2806, 86 L. Ed. 2d 411.* Further, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (per curiam).*

[*9]

> n3 None of the other claims respondent brought against Scott or any other party are before this Court.

II

In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).* If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Ibid.* Although this ordering contradicts "our policy of avoiding unnecessary adjudication of constitutional issues," *United States v. Treasury Employees, 513 U.S. 454, 478,*

*115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995)* (citing *Ashwander v. TVA, 297 U.S. 288, 346-347, 56 S. Ct. 466, 80 L. Ed. 688 (1936)* (Brandeis, J., concurring)), we have said that such a departure from practice is "necessary to set forth principles which will become the basis for a [future] holding [*10] that a right is clearly established." *Saucier, supra, at 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272.* n4 We therefore turn to the threshold inquiry: whether Deputy Scott's actions violated the *Fourth Amendment.*

> n4 Prior to this Court's announcement of *Saucier's* "rigid 'order of battle,'" *Brosseau v. Haugen, 543 U.S. 194, 201-202, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)* (BREYER, J., concurring), we had described this order of inquiry as the "better approach," *County of Sacramento v. Lewis, 523 U.S. 833, 841, n. 5, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)*, though not one that was required in all cases. See *id., at 858-859, 118 S. Ct. 1708, 140 L. Ed. 2d 1043* (BREYER, J., concurring); *id., at 859, 118 S. Ct. 1708, 140 L. Ed. 2d 1043* (STEVENS, J., concurring in judgment). There has been doubt expressed regarding the wisdom of *Saucier's* decision to make the threshold inquiry mandatory, especially in cases where the constitutional question is relatively difficult and the qualified immunity question relatively straightforward. See, *e.g., Brosseau, supra, at 201, 125 S. Ct. 596, 160 L. Ed. 2d 583* (BREYER, J., joined by SCALIA and GINSBURG, JJ., concurring); *Bunting v. Mellen, 541 U.S. 1019, 124 S. Ct. 1750, 158 L. Ed. 2d 636 (2004)* (STEVENS, J., joined by GINSBURG and BREYER, JJ., respecting denial of certiorari); *id., at 1025, 124 S. Ct. 1750, 158 L. Ed. 2d 636* (SCALIA, J., joined by Rehnquist, C.J., dissenting). See also *Lyons v. Xenia, 417 F.3d 565, 580-584 (CA6 2005)* (Sutton, J., concurring). We need not address the wisdom of *Saucier* in this case, however, because the constitutional question with which we are presented is, as discussed in Part III-B, *infra*, easily decided. Deciding that question first is thus the "better approach," *Lewis, supra, at 841, n. 5, 118 S. Ct. 1708, 140 L. Ed. 2d 1043*, regardless of whether it is required.

[*11]

III

A

The first step in assessing the constitutionality of Scott's actions is to determine the relevant facts. As this

case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and respondent's version of events (unsurprisingly) differs substantially from Scott's version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam); Saucier, supra, at 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272.* In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts.

There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals. n5 For example, [*12] the Court of Appeals adopted respondent's assertions that, during the chase, "there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [respondent] remained in control of his vehicle." *433 F.3d at 815.* Indeed, reading the lower court's opinion, one gets the impression that respondent, rather than fleeing from police, was attempting to pass his driving test:

> "Taking the facts from the non-movant's viewpoint, [respondent] remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. He did not run any motorists off the road. Nor was he a threat to pedestrians in the shopping center parking lot, which was free from pedestrian and vehicular traffic as the center was closed. Significantly, by the time the parties were back on the highway and Scott rammed [respondent], the motorway had been cleared of motorists and pedestrians allegedly because of police blockades of the nearby intersections." *Id., at 815-816* (citations omitted).

n5 JUSTICE STEVENS suggests that our reaction to the videotape is somehow idiosyncratic, and seems to believe we are misrepresenting its contents. See *post*, at 4 (dissenting opinion) ("In

sum, the factual statements by the Court of Appeals quoted by the Court . . . were entirely accurate"). We are happy to allow the videotape to speak for itself. See Record 36, Exh. A, available at http://www.supremecourtus.gov/opinions/video/scott_v_harris.rmvb and in Clerk of Court's case file.

[*13]

The videotape tells quite a different story. There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. n6 We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury. n7

n6 JUSTICE STEVENS hypothesizes that these cars "had already pulled to the side of the road or were driving along the shoulder because they heard the police sirens or saw the flashing lights," so that "[a] jury could certainly conclude that those motorists were exposed to no greater risk than persons who take the same action in response to a speeding ambulance." *Post*, at 3. It is not our experience that ambulances and fire engines careen down two-lane roads at 85-plus miles per hour, with an unmarked scout car out in front of them. The risk they pose to the public is vastly less than what respondent created here. But even if that were not so, it would in no way lead to the conclusion that it was unreasonable to eliminate the threat to life that respondent posed. Society accepts the risk of speeding ambulances and fire engines in order to save life and property; it need not (and assuredly does not) accept a similar risk posed by a reckless motorist fleeing the police.

[*14]

n7 This is not to say that each and every factual statement made by the Court of Appeals is inaccurate. For example, the videotape validates

the court's statement that when Scott rammed respondent's vehicle it was not threatening any other vehicles or pedestrians. (Undoubtedly Scott *waited* for the road to be clear before executing his maneuver.)

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Fed. Rule Civ. Proc. 56(c).* As we have emphasized, "when the moving party has carried its burden under *Rule 56(c)*, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (footnote omitted). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise [*15] properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could not have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

**B**

Judging the matter on that basis, we think it is quite clear that Deputy Scott did not violate the *Fourth Amendment.* Scott does not contest that his decision to terminate the car chase by ramming his bumper into respondent's vehicle constituted a "seizure." "[A] *Fourth Amendment* seizure [occurs] . . . when there is a governmental termination [*16] of freedom of movement through means intentionally applied." *Brower v. County of Inyo, 489 U.S. 593, 596-597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)* (emphasis deleted). See also *id., at 597, 109 S. Ct. 1378, 103 L. Ed. 2d 628* ("If . . . the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure"). It is also conceded, by both sides, that a claim

of "excessive force in the course of making [a] . . . 'seizure' of [the] person . . . [is] properly analyzed under the *Fourth Amendment's* 'objective reasonableness' standard." *Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).* The question we need to answer is whether Scott's actions were objectively reasonable. n8

n8 JUSTICE STEVENS incorrectly declares this to be "a question of fact best reserved for a jury," and complains we are "usurping the jury's factfinding function." *Post*, at 7. At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, see Part III-A, *supra*, the reasonableness of Scott's actions -- or, in JUSTICE STEVENS' parlance, "whether [respondent's] actions have risen to a level warranting deadly force," *post*, at 7 -- is a pure question of law.

[*17]

1

Respondent urges us to analyze this case as we analyzed *Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1.* See Brief for Respondent 16-29. We must first decide, he says, whether the actions Scott took constituted "deadly force." (He defines "deadly force" as "any use of force which creates a substantial likelihood of causing death or serious bodily injury," *id.*, at 19.) If so, respondent claims that *Garner* prescribes certain preconditions that must be met before Scott's actions can survive *Fourth Amendment* scrutiny: (1) The suspect must have posed an immediate threat of serious physical harm to the officer or others; (2) deadly force must have been necessary to prevent escape; n9 and (3) where feasible, the officer must have given the suspect some warning. See Brief for Respondent 17-18 (citing *Garner, supra, at 9-12, 105 S. Ct. 1694, 85 L. Ed. 2d 1*). Since these *Garner* preconditions for using deadly force were not met in this case, Scott's actions were *per se* unreasonable.

n9 Respondent, like the Court of Appeals, defines this second precondition as "'necessary to prevent escape,'" Brief for Respondent 17; *Harris v. Coweta County, 433 F.3d 807, 813 (CA11 2005)*, quoting *Garner, 471 U.S., at 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1.* But that quote from *Garner* is taken out of context. The necessity described in *Garner* was, in fact, the need to prevent "serious physical harm, either to the officer or to others." *Ibid.* By way of example only, *Garner* hypothe-

sized that deadly force may be used "if necessary to prevent escape" when the suspect is known to have "committed a crime involving the infliction or threatened infliction of serious physical harm," *ibid.*, so that his mere being at large poses an inherent danger to society. Respondent did not pose that type of inherent threat to society, since (prior to the car chase) he had committed only a minor traffic offense and, as far as the police were aware, had no prior criminal record. But in this case, unlike in *Garner*, it was respondent's flight itself (by means of a speeding automobile) that posed the threat of "serious physical harm . . . to others." *Ibid.*

[*18]

Respondent's argument falters at its first step; *Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force." *Garner* was simply an application of the *Fourth Amendment's* "reasonableness" test, *Graham, supra,* at 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443, to the use of a particular type of force in a particular situation. *Garner* held that it was unreasonable to kill a "young, slight, and unarmed" burglary suspect, *471 U.S., at 21, 105 S. Ct. 1694, 85 L. Ed. 2d 1,* by shooting him "in the back of the head" while he was running away on foot, *id.,* at 4, 105 S. Ct. 1694, 85 L. Ed. 2d 1, and when the officer "could not reasonably have believed that [the suspect] . . . posed any threat," and "never attempted to justify his actions on any basis other than the need to prevent an escape," *id.,* at 21, 105 S. Ct. 1694, 85 L. Ed. 2d 1. Whatever *Garner* said about the factors that *might have* justified shooting the suspect in that case, such "preconditions" have scant applicability to this case, which has vastly different facts. "*Garner* had nothing to do with one car striking another or even with car chases in general . . . . A police car's bumping a fleeing car is, [*19] in fact, not much like a policeman's shooting a gun so as to hit a person." *Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1577 (CA11 1992)* (Edmondson, J., dissenting), *adopted by 998 F.2d 923 (CA11 1993)* (en banc) *(per curiam).* Nor is the threat posed by the flight on foot of an unarmed suspect even remotely comparable to the extreme danger to human life posed by respondent in this case. Although respondent's attempt to craft an easy-to-apply legal test in the *Fourth Amendment* context is admirable, in the end we must still slosh our way through the factbound morass of "reasonableness." Whether or not Scott's actions constituted application of "deadly force," all that matters is whether Scott's actions were reasonable.

2

In determining the reasonableness of the manner in which a seizure is effected, "we must balance the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983).* Scott defends his actions by pointing to the paramount governmental interest [*20] in ensuring public safety, and respondent nowhere suggests this was not the purpose motivating Scott's behavior. Thus, in judging whether Scott's actions were reasonable, we must consider the risk of bodily harm that Scott's actions posed to respondent in light of the threat to the public that Scott was trying to eliminate. Although there is no obvious way to quantify the risks on either side, it is clear from the videotape that respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase. See Part III-A, *supra.* It is equally clear that Scott's actions posed a high likelihood of serious injury or death to respondent -- though not the near *certainty* of death posed by, say, shooting a fleeing felon in the back of the head, see *Garner, supra, at 4, 105 S. Ct. 1694, 85 L. Ed. 2d 1,* or pulling alongside a fleeing motorist's car and shooting the motorist, cf. *Vaughan v. Cox, 343 F.3d 1323, 1326-1327 (CA11 2003).* So how does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability [*21] of injuring or killing a single person? We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to stop. By contrast, those who might have been harmed had Scott not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for Scott to take the action that he did. n10

n10 The Court of Appeals cites *Brower v. County of Inyo, 489 U.S. 593, 595, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989),* for its refusal to "countenance the argument that by continuing to flee, a suspect absolves a pursuing police officer of any possible liability for all ensuing actions during the chase," *433 F.3d at 816.* The only question in *Brower* was whether a police roadblock constituted a *seizure* under the *Fourth Amendment.* In deciding that question, the relative culpability of the parties is, of course, irrele-

vant; a seizure occurs whenever the police are "responsible for the termination of [a person's] movement," *433 F.3d at 816*, regardless of the reason for the termination. Culpability *is* relevant, however, to the *reasonableness* of the seizure -- to whether preventing possible harm to the innocent justifies exposing to possible harm the person threatening them.

[*22]

But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best. Whereas Scott's action -- ramming respondent off the road -- was *certain* to eliminate the risk that respondent posed to the public, ceasing pursuit was not. First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go. Had respondent looked in his rear-view mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they were truly letting him get away, or simply devising a new strategy for capture. Perhaps the police knew a shortcut he didn't know, and would reappear down the road to intercept him; or perhaps they were setting up a roadblock in his path. Cf. *Brower, 489 U.S., at 594, 109 S. Ct. 1378, 103 L. Ed. 2d 628.* Given such uncertainty, respondent might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow. n11

> n11 Contrary to JUSTICE STEVENS' assertions, we do not "assume that dangers caused by flight from a police pursuit will continue after the pursuit ends," *post*, at 6, nor do we make any "factual assumptions," *post*, at 5, with respect to what would have happened if the police had gone home. We simply point out the *uncertainties* regarding what would have happened, in response to *respondent's* factual assumption that the high-speed flight would have ended.

[*23]

Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned-

by-recklessness. Instead, we lay down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the *Fourth Amendment*, even when it places the fleeing motorist at risk of serious injury or death.

* * *

The car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise. Scott's attempt to terminate the chase by forcing respondent off the road was reasonable, and Scott is entitled to summary judgment. The Court of Appeals' decision to the contrary is reversed.

It is so ordered. [*24]

**CONCUR BY:** GINSBURG; BREYER

**CONCUR:**

JUSTICE GINSBURG, concurring.

I join the Court's opinion and would underscore two points. First, I do not read today's decision as articulating a mechanical, *per se* rule. Cf. *post*, at 3 (BREYER, J., concurring). The inquiry described by the Court, *ante*, at 10-13, is situation specific. Among relevant considerations: Were the lives and well-being of others (motorists, pedestrians, police officers) at risk? Was there a safer way, given the time, place, and circumstances, to stop the fleeing vehicle? "Admirable" as "[an] attempt to craft an easy-to-apply legal test in the *Fourth Amendment* context [may be]," the Court explains, "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Ante*, at 10.

Second, were this case suitable for resolution on qualified immunity grounds, without reaching the constitutional question, JUSTICE BREYER's discussion would be engaging. See *post*, at 1-3 (urging the Court to overrule *Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).* In joining the Court's opinion, however, JUSTICE BREYER apparently shares the view that, in the appeal before us, the constitutional [*25] question warrants an answer. The video footage of the car chase, he agrees, demonstrates that the officer's conduct did not transgress *Fourth Amendment* limitations. See *post*, at 1. Confronting *Saucier*, therefore, is properly reserved for another day and case. See *ante*, at 4, n. 4.

JUSTICE BREYER, concurring.

I join the Court's opinion with one suggestion and two qualifications. Because watching the video footage of the car chase made a difference to my own view of the case, I suggest that the interested reader take advantage

of the link in the Court's opinion, *ante*, at 5, n. 5, and watch it. Having done so, I do not believe a reasonable jury could, in this instance, find that Officer Timothy Scott (who joined the chase late in the day and did not know the specific reason why the respondent was being pursued) acted in violation of the Constitution.

Second, the video makes clear the highly fact-dependent nature of this constitutional determination. And that fact-dependency supports the argument that we should overrule the requirement, announced in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), that lower courts must first decide the "constitutional question" **[*26]** before they turn to the "qualified immunity question." See *id.*, at 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 ("The first inquiry must be whether a constitutional right would have been violated on the facts alleged"). Instead, lower courts should be free to decide the two questions in whatever order makes sense in the context of a particular case. Although I do not object to our deciding the constitutional question in this particular case, I believe that in order to lift the burden from lower courts we can and should reconsider *Saucier*'s requirement as well.

Sometimes (*e.g.*, where a defendant is clearly entitled to qualified immunity) *Saucier*'s fixed order-of-battle rule wastes judicial resources in that it may require courts to answer a difficult constitutional question unnecessarily. Sometimes (*e.g.*, where the defendant loses the constitutional question but wins on qualified immunity) that order-of-battle rule may immunize an incorrect constitutional ruling from review. Sometimes, as here, the order-of-battle rule will spawn constitutional rulings in areas of law so fact dependent that the result will be confusion rather than clarity. And frequently the order-of-battle rule violates that **[*27]** older, wiser judicial counsel "not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S. Ct. 152, 89 L. Ed. 101 (1944); see *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"). In a sharp departure from this counsel, *Saucier* requires courts to embrace unnecessary constitutional questions not to avoid them.

It is not surprising that commentators, judges, and, in this case, 28 States in an *amicus* brief, have invited us to reconsider *Saucier*'s requirement. See Leval, Judging Under the Constitution: Dicta About Dicta, *81 N.Y. L Rev. 1249, 1275 (2006)* (calling the requirement "a puzzling misadventure in constitutional dictum"); *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69-70 (CA1 2002)

(referring to the requirement as "an uncomfortable exercise" when "the answer whether there was a violation may depend on a kaleidoscope **[*28]** of facts not yet fully developed"); *Lyons v. Xenia*, 417 F.3d 565, 580-584 (CA6 2005) (Sutton, J., concurring); Brief for State of Illinois et al. as *Amici Curiae*. I would accept that invitation.

While this Court should generally be reluctant to overturn precedents, *stare decisis* concerns are at their weakest here. See, *e.g.*, *Payne v. Tennessee, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)* ("Considerations in favor of *stare decisis*" are at their weakest in cases "involving procedural and evidentiary rules"). The order-of-battle rule is relatively novel, it primarily affects judges, and there has been little reliance upon it.

Third, I disagree with the Court insofar as it articulates a *per se* rule. The majority states: "A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the *Fourth Amendment*, even when it places the fleeing motorist at risk of serious injury or death." *Ante*, at 13. This statement is too absolute. As JUSTICE GINSBURG points out, *ante*, at 1, whether a high-speed chase violates the *Fourth Amendment* may well depend upon more circumstances **[*29]** than the majority's rule reflects. With these qualifications, I join the Court's opinion.

**DISSENT BY:** STEVENS

**DISSENT:**

JUSTICE STEVENS, dissenting.

Today, the Court asks whether an officer may "take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders." *Ante*, at 1. Depending on the circumstances, the answer may be an obvious "yes," an obvious "no," or sufficiently doubtful that the question of the reasonableness of the officer's actions should be decided by a jury, after a review of the degree of danger and the alternatives available to the officer. A high speed chase in a desert in Nevada is, after all, quite different from one that travels through the heart of Las Vegas.

Relying on a *de novo* review of a videotape of a portion of a nighttime chase on a lightly traveled road in Georgia where no pedestrians or other "bystanders" were present, buttressed by uninformed speculation about the possible consequences of discontinuing the chase, eight of the jurors on this Court reach a verdict that differs from the views of the judges on both the District Court and the Court of Appeals **[*30]** who are surely more

127 S. Ct. 1769; 2007 U.S. LEXIS 4748, *;
75 U.S.L.W. 4297

familiar with the hazards of driving on Georgia roads than we are. The Court's justification for this unprecedented departure from our well-settled standard of review of factual determinations made by a district court and affirmed by a court of appeals is based on its mistaken view that the Court of Appeals' description of the facts was "blatantly contradicted by the record" and that respondent's version of the events was "so utterly discredited by the record that no reasonable jury could have believed him." *Ante*, at 7-8.

Rather than supporting the conclusion that what we see on the video "resembles a Hollywood-style car chase of the most frightening sort," *ante*, at 7, n1 the tape actually confirms, rather than contradicts, the lower courts' appraisal of the factual questions at issue. More important, it surely does not provide a principled basis for depriving the respondent of his right to have a jury evaluate the question whether the police officers' decision to use deadly force to bring the chase to an end was reasonable.

> n1 I can only conclude that my colleagues were unduly frightened by two or three images on the tape that looked like bursts of lightning or explosions, but were in fact merely the headlights of vehicles zooming by in the opposite lane. Had they learned to drive when most high-speed driving took place on two-lane roads rather than on superhighways -- when split-second judgments about the risk of passing a slow-poke in the face of oncoming traffic were routine -- they might well have reacted to the videotape more dispassionately.

[*31]

Omitted from the Court's description of the initial speeding violation is the fact that respondent was on a four-lane portion of Highway 34 when the officer clocked his speed at 73 miles per hour and initiated the chase. n2 More significant -- and contrary to the Court's assumption that respondent's vehicle "forced cars traveling in both directions to their respective shoulders to avoid being hit" *ante*, at 6 -- a fact unmentioned in the text of the opinion explains why those cars pulled over prior to being passed by respondent. The sirens and flashing lights on the police cars following respondent gave the same warning that a speeding ambulance or fire engine would have provided. n3 The 13 cars that respondent passed on his side of the road before entering the shopping center, and both of the cars that he passed on the right after leaving the center, no doubt had already pulled to the side of the road or were driving along the shoulder because they heard the police sirens or saw the flashing lights before respondent or the police cruisers approached. n4 A jury could certainly conclude that

those motorists were exposed to no greater risk than persons who saw the same action in [*32] response to a speeding ambulance, and that their reactions were fully consistent with the evidence that respondent, though speeding, retained full control of his vehicle.

> n2 According to the District Court record, when respondent was clocked at 73 miles per hour, the deputy who recorded his speed was sitting in his patrol car on Highway 34 between Lora Smith Road and Sullivan Road in Coweta County, Georgia. At that point, as well as at the point at which Highway 34 intersects with Highway 154 -- where the deputy caught up with respondent and the videotape begins -- Highway 34 is a four-lane road, consisting of two lanes in each direction with a wide grass divider separating the flow of traffic.

> n3 While still on the four-lane portion of Highway 34, the deputy who had clocked respondent's speed turned on his blue light and siren in an attempt to get respondent to pull over. It was when the deputy turned on his blue light that the dash-mounted video camera was activated and began to record the pursuit.

> n4 Although perhaps understandable, because their volume on the sound recording is low (possibly due to sound proofing in the officer's vehicle), the Court appears to minimize the significance of the sirens audible throughout the tape recording of the pursuit.

[*33]

The police sirens also minimized any risk that may have arisen from running "multiple red lights," *ibid*. In fact, respondent and his pursuers went through only two intersections with stop lights and in both cases all other vehicles in sight were stationary, presumably because they had been warned of the approaching speeders. Incidentally, the videos do show that the lights were red when the police cars passed through them but, because the cameras were farther away when respondent did so and it is difficult to discern the color of the signal at that point, it is not entirely clear that he ran either or both of the red lights. In any event, the risk of harm to the stationary vehicles was minimized by the sirens, and there is no reason to believe that respondent would have disobeyed the signals if he were not being pursued.

My colleagues on the jury saw respondent "swerve around more than a dozen other cars," and "force cars traveling in both directions to their respective shoulders,"

127 S. Ct. 1769; 2007 U.S. LEXIS 4748, *;
75 U.S.L.W. 4297

*ante*, at 6, but they apparently discounted the possibility that those cars were already out of the pursuit's path as a result of hearing the sirens. Even if that were not so, passing a slower vehicle [*34] on a two-lane road always involves some degree of swerving and is not especially dangerous if there are no cars coming from the opposite direction. At no point during the chase did respondent pull into the opposite lane other than to pass a car in front of him; he did the latter no more than five times and, on most of those occasions, used his turn signal. On none of these occasions was there a car traveling in the opposite direction. In fact, at one point, when respondent found himself behind a car in his own lane and there were cars traveling in the other direction, he slowed and waited for the cars traveling in the other direction to pass before overtaking the car in front of him while using his turn signal to do so. This is hardly the stuff of Hollywood. To the contrary, the video does not reveal any incidents that could even be remotely characterized as "close calls."

In sum, the factual statements by the Court of Appeals quoted by the Court, *ante*, at 5-6, were entirely accurate. That court did not describe respondent as a "cautious" driver as my colleagues imply, *ante*, at 7, but it did correctly conclude that there is no evidence that he ever lost control of his vehicle. [*35] That court also correctly pointed out that the incident in the shopping center parking lot did not create any risk to pedestrians or other vehicles because the chase occurred just before 11 p.m. on a weekday night and the center was closed. It is apparent from the record (including the videotape) that local police had blocked off intersections to keep respondent from entering residential neighborhoods and possibly endangering other motorists. I would add that the videos also show that no pedestrians, parked cars, sidewalks, or residences were visible at any time during the chase. The only "innocent bystanders" who were placed "at great risk of serious injury," *ante*, at 7, were the drivers who either pulled off the road in response to the sirens or passed respondent in the opposite direction when he was driving on his side of the road.

I recognize, of course, that even though respondent's original speeding violation on a four-lane highway was rather ordinary, his refusal to stop and subsequent flight was a serious offense that merited severe punishment. It was not, however, a capital offense, or even an offense that justified the use of deadly force rather than an abandonment of [*36] the chase. The Court's concern about the "imminent threat to the lives of any pedestrians who might have been present," *ante*, at 11, while surely valid in an appropriate case, should be discounted in a case involving a nighttime chase in an area where no pedestrians were present.

What would have happened if the police had decided to abandon the chase? We now know that they could have apprehended respondent later because they had his license plate number. Even if that were not true, and even if he would have escaped any punishment at all, the use of deadly force in this case was no more appropriate than the use of a deadly weapon against a fleeing felon in *Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)*. In any event, any uncertainty about the result of abandoning the pursuit has not prevented the Court from basing its conclusions on its own factual assumptions. n5 The Court attempts to avoid the conclusion that deadly force was unnecessary by speculating that if the officers had let him go, respondent might have been "just as likely" to continue to drive recklessly as to slow down and wipe his brow. *Ante*, at 12. That speculation is unconvincing as a matter of common [*37] sense and improper as a matter of law. Our duty to view the evidence in the light most favorable to the nonmoving party would foreclose such speculation if the Court had not used its observation of the video as an excuse for replacing the rule of law with its ad hoc judgment. There is no evidentiary basis for an assumption that dangers caused by flight from a police pursuit will continue after the pursuit ends. Indeed, rules adopted by countless police departments throughout the country are based on a judgment that differs from the Court's. See, *e.g.*, App. to Brief for Georgia Association of Chiefs of Police, Inc., as *Amicus Curiae* A-52 ("During a pursuit, the need to apprehend the suspect should always outweigh the level of danger created by the pursuit. When the immediate danger to the public created by the pursuit is greater than the immediate or potential danger to the public should the suspect remain at large, then the pursuit should be discontinued or terminated . . . . Pursuits should usually be discontinued when the violator's identity has been established to the point that later apprehension can be accomplished without danger to the public").

n5 In noting that Scott's action "was *certain* to eliminate the risk that respondent posed to the public" while "ceasing pursuit was *not*," the Court prioritizes total elimination of the risk of harm to the public over the risk that respondent may be seriously injured or even killed. *Ante*, at 12 (emphasis in original). The Court is only able to make such a statement by assuming, based on its interpretation of events on the videotape, that the risk of harm posed in this case, and the type of harm involved, rose to a level warranting deadly force. These are the same types of questions that, when disputed, are typically resolved by a jury; this is why both the District Court and the Court of Appeals saw fit to have them be so decided. Although the Court claims only to have

drawn factual inferences in respondent's favor "*to the extent supportable by the record*," *ante*, at 8, n. 8 (emphasis in original), its own view of the record has clearly precluded it from doing so to the same extent as the two courts through which this case has already traveled, see *ante*, at 2-3, 5-6.

[*38]

Although *Garner* may not, as the Court suggests, "establish a magical on/off switch that triggers rigid preconditions" for the use of deadly force, *ante*, at 9, it did set a threshold under which the use of deadly force would be considered constitutionally unreasonable:

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *471 U.S., at 11-12, 105 S. Ct. 1694, 85 L. Ed. 2d 1.*

Whether a person's actions have risen to a level warranting deadly force is a question of fact best reserved for a jury. n6 Here, the Court has usurped the jury's factfinding function and, in doing so, implicitly labeled the four other judges to review the case unreasonable. It chastises the Court of Appeals for failing to "view the [*39] facts in the light depicted by the videotape" and implies that no reasonable person could view the videotape and come to the conclusion that deadly force was unjustified. *Ante*, at 8. However, the three judges on the Court of Appeals panel apparently did view the videotapes entered into evidence n7 and described a very different version of events:

"At the time of the ramming, apart from speeding and running two red lights, Harris was driving in a non-aggressive fashion (i.e., without trying to ram or run into the officers). Moreover, . . . Scott's path on the open highway was largely clear. The videos introduced into evidence show

little to no vehicular (or pedestrian) traffic, allegedly because of the late hour and the police blockade of the nearby intersections. Finally, Scott issued absolutely no warning (e.g., over the loudspeaker or otherwise) prior to using deadly force." *Harris v. Coweta County, 433 F.3d 807, 819, n. 14 (CA11 2005).*

If two groups of judges can disagree so vehemently about the nature of the pursuit and the circumstances surrounding that pursuit, it seems eminently likely that a reasonable juror could disagree with [*40] this Court's characterization of events. Moreover, under the standard set forth in *Garner*, it is certainly possible that "a jury could conclude that Scott unreasonably used deadly force to seize Harris by ramming him off the road under the instant circumstances." *433 F.3d at 821.*

n6 In its opinion, the Court of Appeals correctly noted: "We reject the defendants' argument that Harris' driving must, as a matter of law, be considered sufficiently reckless to give Scott probable cause to believe that he posed a substantial threat of imminent physical harm to motorists and pedestrians. This is a disputed issue to be resolved by a jury." *Harris v. Coweta County, 433 F.3d 807, 815 (CA11 2005).*

n7 In total, there are four police tapes which captured portions of the pursuit, all recorded from different officers' vehicles.

The Court today sets forth a *per se* rule that presumes its own version of the facts: "A police officer's attempt to terminate a dangerous high-speed car [*41] chase *that threatens the lives of innocent bystanders* does not violate the *Fourth Amendment*, even when it places the fleeing motorist at risk of serious injury or death." *Ante*, at 13 (emphasis added). Not only does that rule fly in the face of the flexible and case-by-case "reasonableness" approach applied in *Garner* and *Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*, but it is also arguably inapplicable to the case at hand, given that it is not clear that this chase threatened the life of any "innocent bystander." n8 In my view, the risks inherent in justifying unwarranted police conduct on the basis of unfounded assumptions are unacceptable, particularly when less drastic measures -- in this case, the use of stop sticks n9 or a simple warning issued from a loudspeaker -- could have avoided such a tragic result. In my judgment, jurors in Georgia should be allowed to evaluate the reasonableness of the decision to ram re-

127 S. Ct. 1769; 2007 U.S. LEXIS 4748, *;
75 U.S.L.W. 4297

spondent's speeding vehicle in a manner that created an obvious risk of death and has in fact made him a quadriplegic at the age of 19.

n8 It is unclear whether, in referring to "innocent bystanders," the Court is referring to the motorists driving unfazed in the opposite direction or to the drivers who pulled over to the side of the road, safely out of respondent's and petitioner's path.

[*42]

n9 "Stop sticks" are a device which can be placed across the roadway and used to flatten a vehicle's tires slowly to safely terminate a pursuit.

I respectfully dissent.

**REFERENCES:**  Go To Full Text Opinion

  Go To Supreme Court Brief(s)

  Go To Supreme Court Transcripts

LEXSEE 2006 US DIST LEXIS 67351



Positive
As of: May 14, 2007

**PATRICIA CRONAUER, et al., Plaintiffs, v. THE UNITED STATES OF AMERICA, et al., Defendants.**

**Civil Action No. 04-1355 (RBW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 67351*

**September 20, 2006, Decided**
**September 20, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Motion dismissed by, Moot *Cronauer v. United States, 2007 U.S. App. LEXIS 7368 (D.C. Cir., Mar. 26, 2007)*

**PRIOR HISTORY:** *Cronauer v. United States, 394 F. Supp. 2d 93, 2005 U.S. Dist. LEXIS 22076 (D.D.C., 2005)*

**COUNSEL:** [*1] For PATRICIA CRONAUER, both individually and as mother and next friend of Andre and Isabelle Moreau, CHRISTIAN MOREAU, both individually and as father and next friend of Andrea and Isabelle Moreau, ANDRE C. MOREAU, by his parents and next friends Christian Moreau and Patricia Cronauer, ISABELLA MOREAU, by her parents and next friends Christian Moreau and Patricia Cronauer, Plaintiffs: Jane Carol Norman, BOND & NORMAN, PLLC, Washington, DC.

For UNITED STATES OF AMERICA, Defendant: Andrea McBarnette, U.S. ATTORNEY'S OFFICE, Washington, DC.

For DISTRICT OF COLUMBIA, Defendant: Urenthea McQuinn, DC OFFICE OF THE ATTORNEY GENERAL, Washington, DC.

For DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, Defendant: Charniele L. Herring, LEFTWICH & LUDAWAY, L.L.C., Washington, DC; Natalie Olivia Ludaway, LEFTWICH & LUDAWAY, Washington, DC; Rebecca Lynn Taylor, LEFTWICH & LUDAWAY, P.L.L.C., Washington, DC;

Urenthea McQuinn, DC OFFICE OF THE ATTORNEY GENERAL, Washington, DC.

For WASHINGTON AREA METROPOLITAN TRANSIT AUTHORITY, Defendant: Jay R. Goldman, WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, OFFICE OF GENERAL COUNSEL, Washington, DC.

For POTOMAC ELECTRIC POWER COMPANY, [*2] Defendant: Ronald Charles Jessamy, Sr., LAW OFFICES OF RONALD C. JESSAMY, PLLC, Washington, DC.

**JUDGES:** REGGIE B. WALTON, United States District Judge.

**OPINION BY:** REGGIE B. WALTON

**OPINION:**

### MEMORANDUM OPINION

Currently before this Court is the District of Columbia's Motion to Dismiss ("Def.'s Mot.") [D.E. # 41] pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. n1 The District of Columbia ("District") asserts that following the United States' dismissal on September 30, 2005, this Court may not exercise supplemental jurisdiction to entertain the plaintiffs' remaining state common law claims of negligence and intentional infliction of emotional distress against the District. For the following reasons, the Court grants the District's dismissal motion.

N1 Although the District requests dismissal pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, because the District's argument in favor of dismissal concerns whether this Court may exercise supplemental jurisdiction to entertain the plaintiffs' claims, the proper standard of review is not *12(b)(6)*, but rather *12(b)(1)*. *Office of Foreign Assets Control v. Voices in Wilderness, 329 F. Supp. 2d 71, 76 (D.D.C. 2004)*. However, the Court's review of the plaintiffs' claims under *12(b)(1)* is not fundamentally different from review under *12(b)(6)*, because both require the Court to accept as true all the factual allegations contained in the plaintiffs' Complaint. See *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*

[*3]

## I. Factual Background

This Court has previously set forth an extensive discussion of the facts in this case. See *Cronauer v. United States, 394 F. Supp. 2d 93, 94-95 (D.D.C. 2005)*. Accordingly, there is no need to provide a discussion of the facts that gave rise to filing of this case. However, in addressing the motion now before the Court, it is helpful to review the procedural background that places this case in its current posture.

On September 30, 2005, this Court issued a Memorandum Opinion and Order dismissing the United States as a defendant because the plaintiffs failed to timely file their administrative tort claims with the appropriate federal agency, as required by the Federal Tort Claims Act, *28 U.S.C. §§ 2671, et seq. (2000)*. *Id. at 105*. In response to the Court's ruling, the plaintiffs filed a Notice of Appeal with the District of Columbia Circuit on October 27, 2005.

With the United States no longer a party to the plaintiff's action, the District filed a Motion to Dismiss on November 18, 2005, alleging that because the Court had dismissed the claims against United States, it no longer should [*4] exercise supplemental jurisdiction over the plaintiffs' remaining state-law claims of negligence and intentional infliction of emotional distress against the District. Def.'s Mot. at 1. The plaintiffs filed their opposition to the District's motion to dismiss, primarily asserting that the Court was without jurisdiction to dismiss the claims against the District while their claims against the United States were on appeal and that, in any event, this Court retained jurisdiction based on the diversity of jurisdiction of the remaining parties. Plaintiff's Opposition to Defendant District of Columbia's Motion to Dismiss ("Pls.' Opp'n") at 1. On December 13, 2005, the District

filed a Reply to the Plaintiffs' Opposition to Defendant's Motion to Dismiss, contending that the plaintiffs' jurisdictional arguments were unfounded. ("Def.'s Reply") at 2-5. Recently, on June 14, 2006, the Court of Appeals dismissed the plaintiffs' appeal for lack of jurisdiction because this "court's order filed September 30, 2005 [did] not adjudicate all the claims against all the parties, and [this] court ha[d] not directed an entry of final judgment." Cronauer v. United States, No. 04-1355, slip. op. [*5] at 1 (D.C. Cir. June 14, 2006) (per curiam).

## II. Standard of Review

### 1. *Rule 12(b)(1)*

Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*, the plaintiffs bear the burden of establishing by a preponderance of the evidence that the court has jurisdiction to entertain their claims. See *Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001)* (holding that the court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); *Pitney Bowes, Inc. V. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998)*. While the Court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to *Rule 12(b)(1)*, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*, because the plaintiff has the burden of proof to establish jurisdiction, the "plaintiff's factual allegations in the complaint ...will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion [*6] for failure to state a claim." *Grand Lodge of Fraternal Order of Police, 185 F. Supp. 2d at 13-14* (citation and internal quotation marks omitted). This scrutiny permits the Court to consider material outside of the pleadings in its effort to determine whether it has jurisdiction. See *EEOC v. St. Francis Xavier Parochial Sch., 326 U.S. App. D.C. 67, 117 F.3d 621, 625 n. 3 (D.C. Cir. 1997)*; *Herbert v. National Academy of Sciences, 297 U.S. App. D.C. 406, 974 F.2d 192, 197 (D.C. Cir. 1992)*; *Haase v. Sessions, 266 U.S. App. D.C. 325, 835 F.2d 902, 906 (D.C. Cir. 1987)*; *Grand Lodge of Fraternal Order, 185 F. Supp. 2d at 14*.

### III. Analysis

The question that the Court must now resolve is whether it should exercise supplemental jurisdiction over the plaintiffs' negligence and intentional infliction of emotional distress claims against the District following the United States' dismissal from this case on September 30, 2005. The District argues that "[i]t is within the [C]ourt's discretion to decline to exercise supplemental jurisdiction over state law claims once federal claims are dismissed." Def.'s [*7] Mot. at 1. They contend that the "'general rule is that, when all federal claims are dis-

missed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on their merits.'" Def.'s Mot. at 2 (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir. 1998). The District further contends that this rule especially holds true when, as in this case, a "request [for dismissal based on lack of supplemental jurisdiction] is [] made at an early stage of litigation." Id. at 2 (citing *Camelio v. Am. Fed'n,* 137 F.3d 666, 672 (1st Cir. 1998).

On the other hand, the plaintiffs argue that this Court must maintain jurisdiction over their negligence and intentional infliction of emotional distress claims because diversity jurisdiction exists between all the parties. n2 Pls.' Opp'n at 1. In response to each of the plaintiffs' arguments opposing the District's dismissal motion, the District argues that dismissal is nonetheless warranted because diversity jurisdiction does not exist between the plaintiffs and the District because although the District of Columbia is considered [*8] a state pursuant to *28 U.S.C. § 1332 (2000), 28 U.S.C. § 1332(a)(1)* only confers jurisdiction upon a district court if the parties are citizens of different states. Def.'s Reply at 2-3. Moreover, the District notes that the plaintiffs have offered no substantive reason why this Court should exercise supplemental jurisdiction over the plaintiffs' state-law claims now that the United States is no longer a party to this action. Id. at 4-5.

> n2 The plaintiff advances two additional reasons why this court should maintain jurisdiction: (1) their claims against the United States are on appeal "and therefore, this Court lacks jurisdiction to dismiss the District of Columbia;" and (2) "the interests of justice and judicial economy dictate that the entire case should wait a decision on plaintiffs' appeal which, if successful, will reinstate the case as to the United States." Pls.' Opp'n at 1. However, these arguments are now moot, as the Circuit has dismissed the appeal. See Cronauer, No. 04-1355, slip. op. at 1.

[*9]

The Court begins its analysis by finding that there is no basis for invoking the Court's original jurisdiction over the District. Contrary to the plaintiffs' assertions, diversity between the plaintiffs and the District does not exist, and therefore the plaintiffs may not utilize *28 U.S.C. § 1332(a)(1)* as a basis for invoking the Court's jurisdiction over the District. n3 *28 U.S.C. § 1332 (a)(1)* only confers diversity jurisdiction upon a district court when the parties are citizens of different states. Here, the

District is not a citizen of any state. *Barwood, Inc. v. Dist. of Columbia,* 340 U.S. App. D.C. 67, 202 F.3d 290, 292 (D.C. Cir. 2000) ("the District of Columbia, like a state, is not a citizen of a state (or of itself) for diversity purposes ...."). Instead, pursuant to *28 U.S.C. § 1332(e),* the District is considered a state for the purposes of diversity jurisdiction, and *28 U.S.C. § 1332* "does not deal with cases in which a State is a party." *Ohio v. Wyandotte Chemicals Corp.,* 401 U.S. 493, 499 n. 3, 91 S. Ct. 1005, 28 L. Ed. 2d 256 (1971).

> n3 *28 U.S.C. § 1332(a)(1)* states that "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between citizens of different States." And, *28 U.S.C. § 1332(e)* provides that "[t]he word 'States', as used in this section, includes ...the District of Columbia[.]"

[*10]

Therefore, because the plaintiffs have not alleged a proper basis for invoking the Court's original jurisdiction over the District, the Court must now assess whether it may exercise supplemental jurisdiction over the plaintiffs state-law claims even though the Court has dismissed all of the plaintiffs' federal claims. District courts will exercise supplemental jurisdiction over state-law claims that are "so related to claims in the action within ...[the district court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *28 U.S.C. § 1367(a) (2000).* However, where all claims over which it has original jurisdiction have been dismissed, "[t]he district court[] may decline to exercise supplemental jurisdiction[.]" *28 U.S.C. § 1367(c).* The District relies upon this provision with the support of Kennedy, where "[t]he Seventh Circuit found that '[a]ccording to the supplemental jurisdiction statute, a district court may decline to exercise supplemental jurisdiction over pendant state law claims if the court has dismissed all claims over which it has [*11] original jurisdiction.'" Def.'s Reply at 5 (quoting *Kennedy,* 140 F.3d at 727).

Here, the District correctly relies upon *28 U.S.C. § 1367(c)(3)* as a basis for asserting that this Court should decline to exercise supplemental jurisdiction over the plaintiffs' negligence and intentional infliction of emotional distress claims because this Court has dismissed "all claims over which it has original jurisdiction." *28 U.S.C. § 1367(c)(3).* n4 Moreover, to insure that the plaintiffs' claims are not lost as a result of the Court's decision, *28 U.S.C. § 1367(d)* provides :

n4 The plaintiffs original complaint included another defendant, 555 Pennsylvania Avenue, N.W. (555 Penn. Ave.) The Court notes that defendant 555 Penn. Ave. was served with the summons and complaint in this action on February 18, 2005, but has never filed an answer to the complaint or participated in any other proceedings. On August 16, 2006, this Court issued an Order for the plaintiffs to show cause to why this action against 555 Penn. Ave. should not be dismissed for failure to prosecute. The plaintiffs' response to the Order to Show Cause was that they had no objection to dismissing 555 Penn. Ave. as a party to this action. Accordingly, based on the plaintiffs representation, 555 Penn. Ave. is hereby dismissed from this action without prejudice.

[*12]

The period of limitations for any claim asserted under *subsection (a)*, and for any

other claim in the same action that is voluntarily dismissed at the same time as or

after the dismissal of the claim under *subsection (a)*, shall be tolled while the

claim is pending and for a period of 30 days after it is dismissed unless State law

provides for a longer tolling period. *28 U.S.C. § 1367(d)*. In other words, "[t]he plaintiffs' action is not time-barred because actions dismissed pursuant to the federal supplemental jurisdiction statute, *28 U.S.C. § 1367*(d ), will not be barred by a statute of limitations because of time lost in federal court." *Meng v. Schwartz, 305 F. Supp. 2d 49, 61 (D.D.C. 2004)*. "The statute expressly tolls the statute of limitations while the claim is pending and provides a period of at least 30 days, more if allowed by state law, after dismissal in which the claim may be refiled in a court of competent jurisdiction." Id. Accordingly, because this Court has dismissed all claims over which it has jurisdiction, and the plaintiffs' can pursue their other claims in the Superior Court of the District [*13] of Columbia, this Court declines to exercise supplemental jurisdiction over the plaintiffs' remaining claims of negligence and intentional infliction of emotional distress.

**IV. Conclusion**

Based on the foregoing analysis, the Court concludes that it should not exercise supplemental jurisdiction over the plaintiffs' negligence and intentional infliction of emotional distress claims against the District. Accordingly, these claims against the District of Columbia are dismissed without prejudice.

**SO ORDERED** on this 20th day of September, 2006. n5

n5 An Order consistent with this Memorandum Opinion is being issued contemporaneously herewith.

REGGIE B. WALTON

United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT T. LEE, *et al.*,                              *

      Plaintiffs                                    *

v.                                                    *          Civil Action No. JDB-06-02184

PHILLIP MORSE., *et al.*,                             *

      Defendants.                                   *

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## AFFIDAVIT OF CPL KIESHA SIMPSON POWELL

I, Kiesha Simpson Powell, swear and affirm under the penalties of perjury and based upon personal knowledge, unless otherwise indicated, as set forth below:

1.     I am over eighteen (18) years of age and I am competent to testify in the above-captioned proceedings as to the matters and facts set forth herein.

2.     I am employed as a law enforcement officer with the Prince George's County Police Department and I have been employed with the department for eight years. My badge number is 2595. On December 24, 2005, I was assigned to the Bureau of Patrol and my name was Kiesha Simpson.

3.     On December 24, 2005 at 0055 hours (12:55 a.m.), I responded to a police dispatch regarding a carjacking that took place at Prince George's Plaza Mall, now known as the Mall at Prince George's, located at 3500 East West Highway, Hyattsville, Maryland 20782. As I arrived at the scene of the reported carjacking, I drove to the rear of Prince George's Plaza Mall near the entrance to the Hecht Company.

4.     I located Errol Robinson, the man whose car was stolen. He told me that an unknown male suspect approached him from an alley adjacent to the Hecht Company and

demanded his vehicle.    Mr. Robinson told me that the suspect placed his hand in his jacket, which Mr. Robinson reported made Mr. Robinson think that the carjacker had a gun.    Mr. Robinson further told me that he eventually complied with the carjacker's demand that Mr. Robinson give the carjacker the keys to Mr. Robinson's car.    Mr. Robinson provided me with the following description of his stolen car:    the stolen car was a red, two door, 2003 BMW Z4, with District of Columbia tags BY-1037.

5.       After receiving the crime details from the victim, I contacted the police department dispatcher and gave her a description of the stolen car and some information about the robbery.    She made a broadcast that I heard advising officers to be on the lookout for the stolen vehicle.    I heard the radio traffic from the Prince George's County Police units in my area that received this broadcast.    Those officers reported their canvassing of the surrounding area, but were unable to locate the stolen vehicle and/or suspect.

6.       I did not leave the scene of the carjacking.    I remained in the mall parking lot with Mr. Robinson until a taxi arrived to drive him home.    Mr. Robinson remained in my squad car with me for approximately fifteen (15) minutes until the taxi arrived.    At no time during the fifteen minute wait was there ever a Prince George's County dispatch indicating that any Prince George's County police officer was in pursuit of the stolen vehicle or the robbery suspect.

7.       I did not pursue the stolen vehicle and/or robbery suspect, because I was unaware of the direction the suspect drove upon fleeing from the mall parking lot, as I did not observe the suspect flee the scene.    I never entered the District of Columbia in pursuit of the stolen car or the robbery suspect.

2

8.    To my knowledge, no one from the Prince George's County Police Department ever participated in any type of pursuit, high speed or otherwise, of Mr. Robinson's stolen vehicle or the robbery suspect.

9.    I never heard any dispatches that reported any chase or pursuit of the stolen car and/or the robbery suspect on our district channel, channel one.  Later that early morning at approximately 0200 hours (2:00 a.m.), the dispatcher to whom I originally reported the robbery called me and told me that the suspect and the carjacked vehicle were involved in a fatal accident while trying to flee from or elude police in the District of Columbia.

10.    On December 24, 2005, I completed in the ordinary course of business an Incident Report regarding the carjacking of Mr. Robinson's car at the Prince George's Plaza Mall, and included information of the subsequent motor vehicle accident that occurred in the District of Columbia involving the stolen vehicle and the suspect.  Attached herewith as Exhibit 1 is a true and accurate copy of the Incident Report that I prepared and signed that day.  The Prince George's County Police Department maintains that Incident Report in the normal course of business.


5/11/07
Date

Cpl. Kiesha Simpson Powell #2595
Cpl Kiesha Simpson Powell ID #2595
Prince George's County Police Department


50002.029:104824

3

**PRINCE GEORGE'S COUNTY POLICE**
**INCIDENT REPORT**

COPY TO

OTHER REPORTS:
ARREST    ACCIDENT
CONTINUATION    J-2
PROPERTY    OTHER
SPECIAL

RA 75

CASE NUMBER: 05 358 - 064
LINKED CASE NUMBER

TYPE OF INCIDENT: Carjacking

LOCATION OF INCIDENT: 3600 East West Hwy. Hyattsville, Md.

DATE/TIME OCCURRED: 12/24/05  2050
DATE/TIME REPORTED: 12/24/05  0055

SUMMARY OF INCIDENT: S/ took victim and fled Parking lot

PERSONS
V-VICTIM    R-REPORTING PERSON
W-WITNESS    P-PRINCE GEORGE'S POLICE DEPARTMENT

CODE: S/A LOI
NAME: LAST Robinson    FIRST Errol    MIDDLE Hugh
ADDRESS 328 Van Buren St. N.W. Wash DC 20012
RACE-SEX-DOB: B M 3-3-38   H N
PLACE OF EMPLOYMENT/SCHOOL/OR OTHER INFORMATION: Hechts X 301
HOME TELEPHONE 202-726-0004
OTHER TELEPHONE 301-557-8800

CODE: S/A LOI
NAME: LAST    FIRST    MIDDLE
ADDRESS    CITY    STATE    ZIP
RACE-SEX-DOB   H N   TELEPHONE

CODE: S/A LOI
NAME: LAST    FIRST    MIDDLE
ADDRESS    CITY    STATE    ZIP
RACE-SEX-DOB   H N   TELEPHONE

A-ARRESTED    B-SUSPECT
F-FIELD OBSERVATION

CODE: 2 S/A LOI
NAME: LAST Unknown    FIRST    MIDDLE    MORE NAMES IN DETAILS? Y N
ADDRESS    "    CITY    STATE    ZIP
RACE-SEX-DOB: B M 25?   H N
TELEPHONE UNK

HGT 5'10  WGT 160  EYES BLK  HAIR UNK  OTHER DESCRIPTION, PHYSICAL APPEARANCE/DESCRIPTION OF WEAPON: Charcoal gray jacket, tan pants, med complex, mustache (NFD)

CODE: S/A LOI
NAME: LAST    FIRST    MIDDLE
ADDRESS    CITY    STATE    ZIP
RACE-SEX-DOB   H N
HGT  WGT  EYES  HAIR  OTHER DESCRIPTION, PHYSICAL APPEARANCE/DESCRIPTION OF WEAPON
TELEPHONE

TOTAL 1

VEHICLE
S-STOLEN    A-VEHICLE AUDIT
R-RECOVERED    I-IMPOUND

CLERK

OWNER: LAST    FIRST    RACE-SEX-DOB   H N
ADDRESS    CITY

OWNER NOTIFIED? Y N  On Scene  DATE/TIME
INSURANCE COMPANY
TELEPHONE

☐ Incident Reportable
☐ No Record found for this person
Re-dissemination prohibited
Destroy when no longer needed

TYPE YR. MAN 05  MAKE AND MODEL BMW 24  STYLE 2DR  COLOR RED
VIN 4USBT334131S44353
LICENSE NUMBER BY U31  STATE DC  MONTH/YEAR 7/06

MILEAGE    REMARKS: Tan convertible top

VALUE $28,000  KEYS IN IGNITION? Y N  MAY VEHICLE BE RELEASED? Y N  WHY? CID Robbery
IMPOUND NR

TOWED BY    IF RECOVERED, JURISDICTION STOLEN FROM
CITY/COUNTY    STATE
VEHICLE AUDIT USE

LOCATION TOWED TO    RESERVED

E/S-COMMUNICATIONS NOTIFIED? Y N  ID C904
ELECTRONIC MAIL
TELEPHONE
DATE/TIME 12/24/05 0155

CONTINUED ON REVERSE? Y N

REPORTING OFFICER: PFC Simpson (Simpson) #2595
BEAT    PAGE  of  PAGES
DIST    APPROVED

| DETAILS | PROPERTY | S - STOLEN E - EVIDENCE | L - LOST | F - FOUND I - IMPOUND INVENTORY | R - RECOVERED | CASE NUMBER 05-358-064 |
| CODE | QTY | ITEM/BRAND | MODEL/STYLE/SIZE SERIAL NUMBER | | ENGRAVINGS / MARKS / COLORS | K - SAFEKEEPING   D - DAMAGED |
| | | | | | | VALUE |

On 12/24/05 at 0055 hrs. I responded to the Rear parking lot of P.G. Plaza located at 3500 East West Hwy. for a carjacking complaint. Once in scene. (V) advised that the unk (S) walked up to him from an alley adjacent to BechtCo. (V) was walking to his vehicle when (S) walked up to him and told him to give him his vehicle. (S) had his right hand inside his coat pocket and implied a weapon. (S) told (V) that he had a gun and that he needed to go to South East tonight. (S) also told (V) that he did jail time for nine years. (V) attempted to talk (S) out of his demands. (V) gave (S) his keys, and (S) fled the parking lot with (VS) vehicle towards Belcrest Rd. A lookout was broadcast via dispatch for suspect and vehicle. Units in the area canvassed the surrounding area with negative Results. (V) was not injured. Notification was made to 1A20 Sgt Simms #2296 (responded). R-23 Detective Pearson #3053 (notified). Further investigation will be conducted by CID-Robbery.

MONTGOMERY 1422 JSP

□ Juvenile Record(s)

\* Notification was made to this officer at 0200 hrs. that the listed vehicle was involved in an accident on the Sousa bridge in Wash. DC. The accident was a fatal and (S) was pronounced shortly after. Inside the listed vehicle there was another passenger that was picked up after (S) carjacked (V's) vehicle. That passenger was taken to Medstar. R-23 and 1A20 was notified at 0227 hrs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT T. LEE, *et al.*,               *

      Plaintiffs              *

v.                        *     Civil Action No. JDB-06-02184

PHILLIP MORSE., *et al.*,           *

      Defendants.           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## AFFIDAVIT OF DETECTIVE PAUL PERSON

I, Paul Person, swear and affirm under the penalties of perjury and based upon personal knowledge, unless otherwise indicated, as set forth below:

1.     I am over eighteen (18) years of age and I am competent to testify in the above-captioned proceedings as to the matters and facts set forth herein.

2.     I am currently employed as a law enforcement officer with the Prince George's County Police Department ("Department") and I have been employed with the Department for ten years. My badge number is 2253. On December 24, 2005, I was assigned to the Criminal Investigation Division, Robbery Section of the Prince George's County Police Department.

3.     On December 24, 2005, I was the detective on duty in the Robbery Section at the time that Errol Robinson reported that his car was stolen as he attempted to enter it after work at the Prince George's Plaza Mall, located at 3500 East West Highway, Hyattsville, Maryland (now known as the Mall at Prince George's).

4.     Officer Keisha Simpson (now Cpl. Keisha Simpson Powell) was the patrol officer who responded to the dispatch and arrived at the scene of the carjacking at the Prince George's Plaza Mall. Cpl. Simpson Powell called into the station and notified me of the carjacking of a

red, two door, 2003 BMW Z4 with District of Columbia tags BY-1037. As the on-duty detective the night of December 24, 2005, I received all communications regarding that carjacking. Additionally, as a detective in the Criminal Investigation Division, Robbery Section, I had and have access to all district radio channels in the Prince George's County Police Department, as the Robbery Section is responsible for responding to any and all reports of robbery throughout Prince George's County.

5.    On December 24, 2005 there were no dispatches on any Prince George's County Police Department channel regarding a high-speed chase and/or the pursuit of Mr. Robinson's stolen car or the carjacking suspect by any member of Prince George's County Police Department.

6.    At no time did I receive any information to indicate that any member of the Prince George's County Policed Department ever was engaged in a high speed chase and/or pursuit of Mr. Robinson's stolen car and/or the carjacking suspect.

7.    At no time during the early morning hours of December 24, 2005, after the suspect escaped in the stolen car from the Prince George's Plaza Mall did any Prince George's County police officer locate the suspect and/or the stolen vehicle. I first learned that the car had been involved in an accident in the District of Columbia at approximately 1:30 am on the morning of December 24, 2005, when I received a call from someone with the Capitol Hill Police Department that the stolen vehicle was involved in a motor vehicle accident in the District of Columbia on Pennsylvania Avenue at the Sousa Bridge while fleeing from Capitol Hill Police Department officers.

8.    After receiving notice of the car accident involving Mr. Robinson's stolen car from the Capitol Hill Police Department, I proceeded to the accident scene in the District of

Columbia to verify that the vehicle was the same vehicle that was stolen from Mr. Errol Robinson at Prince George's Plaza Mall. At the accident scene, I was able to confirm that the vehicle was the same vehicle involved in the carjacking. The car was a red, two-door 2003 BMW Z4 with District of Columbia tags BY-1037. There were no other Prince George's County Police officers at the vehicle accident scene in District of Columbia when I arrived at the scene to investigate the accident. I never was given or uncovered any information that any Prince George's County Police Department officers had been involved in the pursuit and apprehension of Mr. Robinson's stolen car.

9.    In the ordinary course of my investigation and contemporaneous with my investigation, I prepared a Continuation Report which details the information relative to the carjacking and subsequent car accident that I learned during the course of my investigation of the incident. A true and accurate copy of that Continuation Report is attached herewith as Exhibit 1 and is a record maintained in the ordinary course of business by the Prince George's County Police Department. My signature appears at the bottom of the report.

_5- 11- 07_
Date

Detective Paul Person ID #2253
Prince George's County Police Department

50002.029:104980

3

| COPY TO | OTHER REPORTS: | | PRINCE GEORGE'S COUNTY POLICE | CASE NUMBER |
|---|---|---|---|---|
| | ARREST | INCIDENT | **CONTINUATION REPORT** | 05-358-064 |
| | PROPERTY | DEATH | | LINKED CASE NUMBER |
| | MISSING PERSON | | | |

| TYPE OF INCIDENT | DATE/TIME OCCURRED |
|---|---|
| Armed Carjacking | 12-24-05/ 0050 hrs |

**LOCATION OF INCIDENT**
3500 East West Highway, Hyattsville, Maryland

DATE/TIME REPORTED
12-24-05/ 0050 hrs

**NAME OF PRINCIPAL PERSON INVOLVED (LAST, FIRST, MIDDLE)**
ROBINSON, Errol Hugh

*****INITIAL*****

******* NO RESPONSE *******

VICTIM: #1   ROBINSON, Errol Hugh, B/M, 03-02-38
1328 Van Buren St, (202) 726-0004
Washington D.C. 20012

WITNESSES:   None

M.O.:   Suspect approached the victim implied that he had a handgun took vehicle fled.

SUSPECT:   B/M/ 5'10, 160lbs, 25yrs, mustache, gray jacket, tan pants (NFD)

WEAPON:   Unknown type handgun.

SUSPECT VEH: None

DETAILS:      On the listed date and time the victim reported a carjacking to this agency. The victim advised that as he was exiting his vehicle he was approached by the listed suspect. The suspect put his hand in his pocket and implied that he had a handgun. He then demanded that the victim get out of the vehicle. Fearing for his life the victim complied and exited the vehicle. The suspect then got into the vehicle and fled the area making good his escape.
      At 0130hrs this detective was notified by P/O Arellano #5606 ,Capitol Hill Police Department(CHPD), that the vehicle was involved in a motor vehicle accident in Washington DC on Pennsylvania Ave at the Sousa Bridge. The vehicle was occupied with three occupants. Two of the occupants were killed during the accident and a third was ejected and later transported to MEDSTAR with serious injuries.  The accident is an ongoing case and is being handled by Det Millett (CHPD) (202) 497-1440 .

PROPERTY TAKEN:   2003 BMW  Z4, 2dr, red w/tan convertible top, D.C. tag #BY-1037, 4USBT33413LS44253

VIDEO             None

WEATHER:          Clear 30's

PROCESSING        None

REPORTING OFFICER: P/O Simpson #2595

| REPORTING OFFICER | ID | | | PAGE 1 OF 1 PAGES |
|---|---|---|---|---|
| Detective Person | 2253 | | | |
| | | BEAT 12 | DIST I | APPROVAL          ID |

P.G.C. FORM #3529A (7/86)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT T. LEE, *et al.*,                         *

      Plaintiffs                         *

v.                                                            *          Civil Action No. JDB-06-02184

PHILLIP MORSE., *et al.*,                       *

      Defendants.                       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF DETECTIVE GREG DOMOGAUER

I, Greg Domogauer, swear and affirm under the penalties of perjury and based upon personal knowledge, unless otherwise indicated, as set forth below:

1.     I am over eighteen (18) years of age and I am competent to testify in the above-captioned proceedings as to the matters and facts set forth herein.

2.     I am currently employed as a law enforcement officer with the Prince George's County Police Department (the "Department") and I have been employed with the Department for eighteen years. My badge number is 1539. On December 24, 2005, I was assigned to the Carjacking Unit of the Prince George's County Police Department.

3.     On December 24, 2005, I was off duty at the time of the reported carjacking of Mr. Errol Robinson, and his red, two-door, 2003 BMW Z4 sports car, with District of Columbia tags BY-1037. I was assigned to investigate the carjacking on December 28, 2005.

4.     On January 2, 2006, as part of my investigation of the carjacking, I interviewed the victim, Errol Robinson. During my interview of Mr. Robinson on January 2, 2006, I provided him with a blank copy of the Prince George's County Police Department Statement of Victim form #2998. Mr. Robinson prepared a handwritten statement on that form which

contains his statements to me regarding the carjacking on December 24, 2005. A true and accurate copy of the Prince George's County Police Department Statement of Victim form #2998 that was completed in my presence by Mr. Robinson is attached hereto as Exhibit 1, and is a record maintained by the Prince George's County Police Department in the ordinary course of business. As reported by Mr. Robinson, a young male suspect approached him while he was leaving The Hecht Company at Prince George's Plaza Mall, now known as "The Mall at Prince George's", located at 3500 East West Highway, Hyattsville, Maryland 20782. The suspect demanded that Mr. Robinson relinquish the keys to his vehicle. As further reported Mr. Robinson, the suspect placed his hand in his jacket suggesting that he had a gun, and when Mr. Robinson gave the suspect his car keys, the suspect fled the parking lot in the victim's car.

5.    I also interviewed Alyce Summers on January 2, 2006 at her residence, which was located at 2820 Buena Vista Terrace, S.E. Washington, D.C. She told me that Matthew Devon Patrick, the young man who was reported by the Metropolitan Police Department ("MPD") as the decedent who was driving the stolen BMW when it crashed early on the morning of December 24, 2005, offered Ms. Summers and her deceased friend, Jewell West, who were walking home from a movie, a ride. Ms. Summers reported to me that she and Ms. West did not know the suspect prior to this encounter. Ms. Summers reported that she had no knowledge that the BMW was stolen or that the suspect was being pursued by police when she entered the stolen car. She did not report observing any police or police car when she entered the stolen car. Ms. Summers advised that when she became aware that the driver was speeding away from the police, she closed her eyes and the next thing that she remembered was waking up in the hospital.

2

6.    As part of my investigation, I was responsible for determining what, if any, involvement officers of the Prince George's County Police Department had in the apprehension of the stolen car and the arrest of the driver. Before closing the case, I had to determine what happened. Contemporaneous with and as part of my investigation of the carjacking, I prepared a Continuation Report, which contains my contemporaneous written statements of the information I learned and gathered during the course of my investigation. A true and accurate copy of the Continuation Report is attached hereto as Exhibit 2, and is a record maintained by the Prince George's County Police Department in the ordinary course of business.

7.    To my knowledge, no Prince George's County Police Department officer ever engaged in the pursuit, let alone the high-speed pursuit, of the stolen car at anytime, whether in the State of Maryland or in the District of Columbia. The car already had fled from the scene of the carjacking at the time that Officer Kiesha Simpson (now Cpl. Kiesha Simpson Powell) arrived to take the statement of Mr. Robinson. The only action taken was a "call-in" of the stolen license number and vehicle type to the Prince George's County dispatcher. I believe, although I do not have personal knowledge, that a look-out for the stolen car was broadcast by the Prince George's County dispatcher(s). To my knowledge, no Prince George's County police officer ever spotted the vehicle prior to its crashing within approximately two hours after the carjacking in the District of Columbia. To my knowledge, no incident report ever was prepared by any Prince George's County police officer indicating that such officer was involved in the pursuit of Mr. Robinson's BMW in the early morning hours of December 24, 2005. If an officer from the Prince George's County Police Department had been involved in such a pursuit, such officer would have been required to prepare some type of written documentation and/or records,

and I would have uncovered such documentation and/or records during my investigation of the carjacking.

8.     On January 4, 2006, I met with Detective Sheryl Harley of the Metropolitan Police Department ("MPD"), Accident Reconstruction Unit. Detective Harley informed me that Matthew Devon Patrick, the young man who stole Mr. Robinson's car, was engaged in a high speed chase with the United States Capitol Police Department arising out of a traffic offense, unrelated to the carjacking. Detective Harley gave me a copy of the MPD Traffic Accident Report that she completed and signed. A true and accurate copy of the MPD Traffic Accident Report that she gave to me is attached hereto as Exhibit 3, and is a record maintained by the Prince George's County Police Department in the ordinary course of business.

05/14/07
_____
Date

_____ #1539
Detective Greg Domogauer
Prince George's County Police Department

50002.029:104896

4

PRINCE GEORGE'S COUNTY POLICE DEPARTMENT
STATEMENT OF VICTIM/WITNESS/SUSPECT

CCN: 05-358-064     DATE: 01/2/06     TIME: 1340

STATEMENT OF: Robinson, Errol Hugh
HOME ADDRESS: 1328 Van Buren St. WDC.     PHONE: (202) 726-0004
BUSINESS ADDRESS: _____     PHONE: _____
SEX/RACE/DOB: B/m 03-02-38     POB: _____
WEIGHT: _____ HAIR: _____ EYES: _____ SSN: _____     HEIGHT: _____
DRIVER'S LICENSE NO: _____
STATEMENT TAKEN BY: Domacaver #1539     TYPE OF OFFENSE: _____     LOCATION: P.G. Plaza / Hechts Company

STATEMENT: On the evening of December 23 2005 while leaving
The Hechts Co. where I work at Prince George Plaza, before
I could get to my car (24 Bm @ 2003 Red Merlot Conv top) A young man
Approached and demanded That he wanted my car his hands
was in his pocket implying he had a rubber. I then Tried to
I talk him out of his intentions, he then raised his arm to my
chest and told me I was and elderly person and I shuld not
be stupid and get hurt. I then decided to give him the
keys of my key chain and he sped off in the direction of
Belcrest Ade. I describe him as and 20' young Afro American
Light skinned 5'10' 160 LBS

I HAVE READ THE ABOVE STATEMENT CONSISTING OF 1 PAGE(S). THIS STATEMENT IS TRUE AND
CORRECT TO THE BEST OF MY KNOWLEDGE.

_____
WITNESSED BY

_____
Errol H. Robinson
SIGNATURE

P.G.C. FORM #2998  3/84

| COPY TO | OTHER REPORTS: | PRINCE GEORGE'S COUNTY POLICE | CASE NUMBER |
|---|---|---|---|

OTHER REPORTS:
ARREST          INCIDENT
PROPERTY        DEATH
MISSING PERSON

**PRINCE GEORGE'S COUNTY POLICE**
**CONTINUATION REPORT**

CASE NUMBER
05-358-064

LINKED CASE NUMBER

TYPE OF INCIDENT
Carjacking

DATE/TIME OCCURRED
12-24-05 @ 0050

LOCATION OF INCIDENT
3500 East West Hwy.  Hyattsville,  Md.

DATE/TIME REPORTED
01-03-06 @ 0900

NAME OF PRINCIPAL PERSON INVOLVED (LAST, FIRST, MIDDLE)
Robinson, Errol

# 2

VICTIM:          Robinson, Errol Hugh          B/ M 03-02-38
                 1328 Van Buren St.            HP: (202)726-0004
                 Washington D.C.

ACCUSED:         Patrick, Matthew Devon        B/M  01-11-82
                 1711 Benning Rd. # F34
                 N.E. Washington D.C.

SUSPECT:     #1  West, Jewell                  B/F  18
                 1203 C Street # 2
                 N.E. Washington  D.C.

             #2  Summers, Alyce                B/F  17
                 2820 Buena Vista Terr.
                 S.E. Washington D.C.

WEAPON:          Implied handgun

DETAILS:  On 12-24-05 @ 0050 hrs. the victim advised that he was exiting his vehicle in the 3500 blk of East West Hwy. / Parking lot of Hechts Company. The accused suspect approached him on foot and implied that he had a handgun in his pocket; demanded the victims vehicle. The victim was in fear of his life and complied with the suspects demands. The suspect entered the victims vehicle and fled the scene, making good his escape.

On 12-24-05 @ 0120 hrs. the above listed accused subject along with two female subjects were involved in a fatal automobile accident in the location of the 1700 blk of Pennsylvania Ave. S.E. Washington D.C. . The accused and suspect #1 were killed in the accident. Suspect # 2 received minor injuries during the accident.

On 01-02-06 suspect # 2 was interviewed reference the incident. The suspect advised that she and her friend suspect #1 were walking home from the movies. The accused drove up to them in the BMW and offered them a ride. The two females accepted the ride from the accused. Suspect #2 advised that she didn't know the accused and didn't know  anything about the carjacking. The suspect then advised she noticed the police chasing them. She then advised that her and her friend closed their eyes and the next thing she remembered was waking up in the hospital. The suspect was found not to be involved in the carjacking.

Due to the accused suspects description matching the suspect who committed the robbery and the accused being in possession of the victims vehicle within 40 minutes. The case will be closed exceptionally due to the death of the accused suspect.

VEH. TAKEN:     2003 BMW Z4 , 2dr., red, D.C. reg. BY-1037, Vin # 4USBT33413LS44253

CASE STATUS:     CLOSED / Exceptionally

| | | PAGE 1 OF 1 PAGES |
|---|---|---|
| REPORTING OFFICER Det. Derrogauer | D  1539 | BEAT 12 | DIST I | APPROVAL Sgt. Duane P. Morley #1485 |

P.G.C. FORM #3529A (7/86)

MPD 05-50

PD 10 Rev. 7/86   Prescribing Directive G.O 401.3

# TRAFFIC ACCIDENT REPORT

Metropolitan Police Department, Washington, D. C.

| 1. DATE OF ACCIDENT | 2. TIME (Mil Military) | 3. DAY OF WEEK | 4. DATE OF THIS REPORT | 5. TYPE OF ACCIDENT (CHECK ALL THAT APPLY, EXCEPT FOR PROPERTY DAMAGE) | 43. COMPLAINT NUMBER |
|---|---|---|---|---|---|
| 12-24-05 | 0120 hours | Sat | 12-24-05 | | 05/173-180 |

1700 Block Pennsylvania Avenue S.E. (Eastbound)

## STRIKING OBJECT

**1.** Driver / Pedestrian / Fixed Object

Patrick, Matthew Devon
1711 Benning Road N.E. Apt#734  WDC 20002
01-11-82
Veh. 1  3  2  N  3A  4 1
1D  107  2

**OWNER**: None

**3.** Driver / Pedestrian / Fixed Object

Metal Streetlight Pole
N/A

## STRIKING OBJECT

**2.** Driver / Pedestrian / Fixed Object

Robinson, Errol Hugh
1328 Van Buren Street N.W. WDC 20012
BY1037 DC 06  33413LS44253
2003  2D  Mar
01-17-56

**OWNER**: D.C. Government
441 4th Street N.W. WDC 20001

**4.** Driver / Pedestrian / Fixed Object

Inground Metal Conduit Box
Hood-Bey, Claude C.
4203 Russell Avenue Apt#4 Mt Rainier MD 20702
H 310-119-107-047  MD

**OWNER**: D.C. Government
441 4th Street N.W. WDC 20001

Driver
S/A

## CODES

| | MK | YEAR | MAKE | MODEL/TYPE | BODY | | |
|---|---|---|---|---|---|---|---|
| | Tk | 2005 | Ram Dodge | S11 | 59R087 MD 06 | 18N6S214742 |

## Non-Involved Witnesses

**PHONE NUMBER**   **ADDRESS**

See   PD 854

## PERSONS INVOLVED

| | NAME / ADDRESS / PHONE NO. | AGE | SEX | SEAT BELT | CODE | AIR BAG | CODE | INJURY |
|---|---|---|---|---|---|---|---|---|
| Driver #1 | West, Jewell  1203 C Street N.E. Apt#2 | 22 | M | 01 | 01 | 02 | 04 | 01 |
| | Summers, Alyce  2820 Buena Vista Terrace S.E. | 18 | F | 01 | 02 | 04 | 04 | 01 |
| Driver #2 | | 17 | F | 01 | 03 | 02 | 04 | 03 |
| | | 49 | M | 02 | 01 | 03 | 04 | 01 |

Page 3 of 4 Pages

Complaint No. 05/173-180

**NARRATIVE:** Give a concise statement, in your own words, of the facts that are not covered in this report, or to clarify any items that are not satisfactorily explained. Use Continuation Sheet of report for additional space. If statements are taken, use PD 118 (Def./Suspect Statement), or PD 119 (Compl./Witness Statement). If accident occurred in a construction zone, describe the type of construction.

On Saturday, December 24, 2005 at approximately 0120 hours, vehicle#1 was traveling eastbound in the 1700 block of Pennsylvania Avenue S.E. at a high rate of speed. Vehicle #1 failed to negotiate the curve and struck the north curb. The vehicle continued in an eastward direction, partially on the roadway and partially on the north sidewalk. Vehicle #1 continued into the grassy median and struck object #2, an underground metal conduit box. The collision caused the vehicle to begin to rotate as it re-entered the roadway. Vehicle #1 continued across the three eastbound lanes of Pennsylvania Avenue and mounted the southside curb; where it struck object #3, a metal streetlight pole. Vehicle #1 continued across the south side and onto the roadway which was the access ramp from the

Sheryl R. Earley    BADGE NO. IV0067    UNIT PTSD

SIGNATURE OF REVIEWING OFFICIAL    BADGE NO. 558Y FSO    UNIT

REVIEWER    DISTRIBUTION

NORTH

Complaint No. 05/173-180

| | Name of Injured Person | Where Taken (Hospital) | By Whom | Status | TEB Notified (Name) | Teletype Notified (Name) | Relative Notified (Name) |
|---|---|---|---|---|---|---|---|
| INJURED TO HOSPITAL | Patrick, Matthew Devon | D.C.M.E. | D.C.M.E. | Admitted / Released | | S.O.C.C. | West, Judy |
| | West, Jewell | D.C.M.E. | D.C.M.E. | Admitted / Released | | S.O.C.C. | |
| | Summers, Alyce | Howard Hospital | Medic | Admitted / Released | | S.O.C.C. | |
| | | | | Admitted / Released | | | |
| | | | | Admitted / Released | | | |
| | | | | Admitted / Released | | | |

44. DIAGRAM: THE FACTS CONTAINED HEREIN IN THIS DIAGRAM ARE NOT ACCURATELY DRAWN...

1700 BLK PENNSYLVANIA AVE
IN GROUND
METAL CONDUIT BOX
(OBJECT #2)

METAL STREET LIGHT
(OBJECT #3)

SPEED LIMIT
25 MPH

**VEHICLE NO. 1**
44. DIRECTION OF TRAVEL AND STREET: E/B Penn Ave., S.E.
45. VEHICLE WAS: TOWED BY / DRIVEN AWAY BY
46. NAME: M.P.D. Crane 3
47. LOCATION TOWED TO: Mobile Crime

44. CIRCLE ALL NUMBERS WHERE THERE IS DAMAGE
13 Hood / 14 Roof / 15 Trunk / 16 Undercarriage / 17 Overturned / 18 Other (Explain in Narrative)

**VEHICLE NO. 2**
44. DIRECTION OF TRAVEL AND STREET: Stopped on ramp
45. VEHICLE WAS: TOWED BY / DRIVEN AWAY BY
46. NAME: Able towing
47. LOCATION TOWED TO:

44. CIRCLE ALL NUMBERS WHERE THERE IS DAMAGE
13 Hood / 14 Roof / 15 Trunk / 16 Undercarriage / 17 Overturned / 18 Other (Explain in Narrative)

**VEHICLE NO. 3**
44. DIRECTION OF TRAVEL AND STREET:
45. VEHICLE WAS: TOWED BY / DRIVEN AWAY BY
46. NAME:
47. LOCATION TOWED TO:

44. CIRCLE ALL NUMBERS WHERE THERE IS DAMAGE
13 Hood / 14 Roof / 15 Trunk / 16 Undercarriage / 17 Overturned / 18 Other (Explain in Narrative)

**VEHICLE NO. 4**
44. DIRECTION OF TRAVEL AND STREET:
45. VEHICLE WAS: TOWED BY / DRIVEN AWAY BY
46. NAME:
47. LOCATION TOWED TO:

44. CIRCLE ALL NUMBERS WHERE THERE IS DAMAGE
13 Hood / 14 Roof / 15 Trunk / 16 Undercarriage / 17 Overturned / 18 Other (Explain in Narrative)

NOTE: This report is used for statistical analysis of vehicular accidents and the prevention thereof. The data given represents the opinion and conclusions of the reporting officer based on his/her judgment after considering all of the facts disclosed through his/her investigation of this accident.

| Item No. | CONTINUATION SHEET *[List item number of section continued with required information.]* ▲ Complaint No. 05/173-180 |
|---|---|
|  | Southeast/Southwest Freeway onto eastbound Pennsylvania Avenue. Vehicle #1 struck a 2005 Dodge Ram Pick-up truck |
|  | which was stopped and awaiting the greenlight. Vehicle #1 pushed the second vehicle into the concrete jersey |
|  | barrier, on the far right side of the ramp. Two of the three occupants of vehicle #1 were ejected from the |
|  | automobile. Vehicle #1 came to rest along side of vehicle #2, facing in the wrong direction on the ramp. Driver #1 |
|  | was trapped in the vehicle, in an unconscious state suffering from injuries incompatible with life. |
|  | Investigation revealed that vehicle #1 had been stolen from Prince Georges County, Maryland in an armed |
|  | carjacking, approximately 30 minutes before the collision. Minutes before the collision, an officer with the |
|  | United States Capitol Police attempted to stop the vehicle in an unrelated traffic offense. It was at that time |
|  | that vehicle #1 sped away and was lost by the officer. |
|  | A passenger from vehicle #1 was transported from the scene to Howard University Hospital with non-life |
|  | threatening injuries. The driver and a second passenger were transported from the scene to the D.C.M.E. and were |
|  | pronounced by Dr. A. Wayne Williams at 0806 hours. These deaths are MCIU D05-48 and 05-49. |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT T. LEE, *et al.*,                                    *

      Plaintiffs                              *

v.                                                          *     Civil Action No. JDB-06-02184

PHILLIP MORSE., *et al.*,                                  *

      Defendants.                             *

*   *   *   *   *   *   *   *   *   *   *   *

## AFFIDAVIT OF RAY GHEEN

I, Ray Gheen, swear and affirm under the penalties of perjury and based upon personal knowledge, unless otherwise indicated, as set forth below:

1.     I am over eighteen (18) years of age and I am competent to testify in the above-captioned proceedings as to the matters and facts set forth herein.

2.     I am employed as the Chief of Investigation for the Prince George's County Office of Law ("Office of Law"). I have been employed in that capacity for the past eighteen (18) years. Prior to assignment to my current position, I worked for seventeen (17) years as an officer with the Prince George's County Police Department (the "Department").

3.     I am employed as an investigator and provide assistance to the attorneys in the Office of Law with the factual investigations of claims and cases filed against Prince George's County (the "County"). One of the functions I routinely perform is to gather County records concerning a pending matter. I am very familiar with the different types of records maintained in the ordinary course of business by the Prince George's County Police Department. With regard to investigations of cases involving the Prince George's County Police Department and its police officers, my duties and responsibilities include conducting investigations of facts, data, records

and information and collecting and reviewing all collected reports and information relevant to a specific case, claim or matter.

4.      With respect to the above captioned case, I was requested to gather any and all of the records of Prince George's County relative to the carjacking of the car owned by Errol Robinson, a red, two door, 2003 BMW Z4, with District of Columbia tags BY-1037, around midnight on December 23-24, 2005, and to determine what, if any, involvement the County had in investigating the carjacking and resolving the matter.

5.      I have researched all of the existing documents and data bases currently maintained by the County and gathered all of the records maintained by the County relative to that matter.  extensively checked all records, data entries, sources of information, and all possible sources that could provide substantive findings of fact relative to the carjacking at Prince George's Plaza Mall (now known as the Mall at Prince George's) on December 24, 2005.  Based upon my review, search, and inquiry into all potential sources of information, I have found that neither the Prince George's County Police Department nor any of its police officers were involved in any type of pursuit or chase of the car stolen from Mr. Errol Robinson on December 24, 2005.

6.      Based upon my review of all available records, the extent of the Department's involvement with respect to the stolen vehicle was that it responded to the "distress call" of a carjacking involving the victim, Mr. Errol Robinson.  An on-duty patrol police officer in the area of the carjacking, Cpl. Kiesha Simpson (now known as Kiesha Simpson-Powell - she has married) responded to the scene within minutes of being dispatched to investigate a reported carjacking.  Officer Simpson-Powell collected information and details relative to the carjacking, *i.e.* the vehicle's make, model, color, as well as license plate numbers, and a description of the

suspected armed carjacker.    Officer Simpson-Powell radioed those details to a County dispatcher.

7.    There is no record that any officer of the Department ever pursued the carjacked vehicle.  Any officer who participated in the pursuit of the carjacked vehicle would have been required to complete an Incident Report detailing said officer's involvement, and such Incident Report would have been maintained in the ordinary course of business by the Department.  There are not any records that indicate that anyone from the County actively participated in the pursuit of Mr. Robinson's stolen car or the apprehension of the suspected carjacker.

8.    The Department did not learn and/or receive any additional information about the carjacked vehicle and/or the suspected carjacker until it was notified by the Capitol Hill Police Department at approximately 0130 hours (1:30 a.m.) on December 24, 2005 that the carjacked vehicle had crashed, and the driver and an occupant had been killed at 1700 block of Pennsylvania Avenue, S.E., Washington, DC.  Prior to this notification of the vehicle accident, there is no record of any communication between the Department and the Metropolitan Police Department or the Capitol Hill Police Department.


_5-11-07_
Date

_Ray H. Gheen_
Ray Gheen
Chief of Investigation
Prince George's County Office of Law

50002.029:105012